Argued and submitted January 6; reassigned July 16, accused disbarred
December 17, 1998

In re Complaint as to the Conduct of

# THANE W. MARTIN,
*Accused.*

(OSB 94-157, 94-158; SC S44004)

970 P2d 638

Thane W. Martin, Wilsonville, argued the cause and filed the brief *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.*

PER CURIAM

---

* Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar filed a complaint charging that the accused had violated Code of Professional Responsibility Disciplinary Rules (DR) 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) (three counts); DR 9-101(A) (failure to deposit client funds in trust account) (three counts); DR 9-101(A)(2) (failure to deposit disputed funds in trust account) (two counts); DR 2-110(A)(2) (failure to take reasonable steps to avoid foreseeable prejudice to client before withdrawing from employment); DR 9-101(C)(3) (failure to maintain records of client funds and to account for those funds) (two counts); and DR 1-103(C) (failure to respond fully and truthfully to investigatory inquiries).

A trial panel of the Disciplinary Board found that the accused had committed two of the alleged violations of DR 1-102(A)(3), but not the third; all three alleged violations of DR 9-101(A); a violation of DR 2-110(A)(2); and one of the alleged violations of DR 9-101(C)(3), but not a second. The trial panel also found that the accused did not violate DR 9-101(A)(2) or DR 1-103(C). Based on its findings that the accused had converted client funds, DR 1-102(A)(3), the trial panel determined that the appropriate sanction was disbarment.

The matter comes before us pursuant to ORS 9.536(2) and Bar Rules of Procedure (BR) 10.1 and 10.4. On review, the accused challenges only the trial panel's conclusion that twice he converted client funds and thereby violated DR 1-102(A)(3). The Oregon State Bar (Bar) contends that the accused's conduct was at least knowing, that he therefore committed both violations, and that he should be disbarred.

This court reviews the trial panel's decision *de novo*. ORS 9.536(3). The Bar had the burden of proving misconduct by clear and convincing evidence. ORS 9.536(2); BR 5.2. For the reasons that follow, we conclude that the accused committed the violations of DR 9-101(A), DR 2-110(A)(2), and DR 9-101(C)(3), as found by the trial panel, and that the accused converted client funds on one occasion in violation of DR

1-102(A)(3). We further conclude that the appropriate sanction is disbarment.

We find the following facts. The accused was admitted to the practice of law in 1992. When he began practicing law, he worked during the day at a full-time, manufacturing job and attempted to manage a solo law practice in the evening. The charges in this case arise out of the accused's handling of two separate client matters in 1993 and 1994.

In February 1993, the accused was appointed by the United States District Court to represent Rosemarie Murphey on a *pro bono* basis. Murphey, one of the accused's first clients, was an indigent plaintiff in a federal discrimination case. Under the program pursuant to which the accused was appointed, he was to be paid only if Murphey prevailed and the trial court awarded attorney fees. Murphey paid the accused $1,000 for costs (with fees to be provided only if Murphey prevailed and fees were awarded) and the accused promised to provide a monthly accounting to Murphey. The accused then put Murphey's money in an envelope in his desk, because he did not yet have a trust account.

When the accused later opened a trust account on March 1, 1993, he did not deposit Murphey's money. Instead, he withdrew money from the envelope from time to time, noting on the envelope the purpose of the withdrawal. At the time of the hearing on the disciplinary charges, the accused had lost the envelope and had no other record of expenses incurred on Murphey's behalf.

Several months after their first meeting, the accused filed an amended complaint on Murphey's behalf. In late August 1993, the accused was injured in an automobile accident. Two weeks later, he discussed the case with Murphey, but did not mention his accident, even though he later would represent to the district court that the injury affected his ability to work on her case. A few days later, Elizabeth Clark, a lawyer who was associated with the accused, informed Murphey about the accused's accident and requested Murphey's permission to work on the case. At that time, Clark informed Murphey that the accused had spent $816 of the $1,000 and that the accused needed $500 more to cover

discovery and settlement expenses. Murphey responded that she did not have an additional $500 and that she never had received an accounting for her original deposit.

Meanwhile, in September 1993, the defendant had filed a motion to dismiss or, alternatively, for summary judgment, in Murphey's case. The accused did not send a copy of that motion to Murphey. In late October 1993, the accused moved to withdraw from his representation of Murphey, purportedly as a result of the injuries that he had sustained in the accident. The accused sent a copy of that motion to withdraw to Murphey, but with no additional explanation. In November 1993, the district court granted the defendant's motion to dismiss and the accused's motion to withdraw.

Murphey first learned of the defendant's motion to dismiss when she received a copy of the court's order granting it in November 1993. She later was able to revive the action by filing a *pro se* objection to the defendant's motion to dismiss, together with a request for new counsel. A new lawyer, Hutchinson, eventually was appointed.

Later in November, Murphey complained to the Indigent Representation Supervisory Committee of the United States District Court about the accused's use of her funds and his failure to provide an accounting. In February and March 1994, Hutchinson repeatedly requested an accounting from the accused. Eventually, she complained to the Bar on Murphey's behalf. In late March 1994, the accused sent Hutchinson a brief letter, reporting that there were four entries on Murphey's "account" that totaled $816. The expenditures were for payments to Clark and to a law clerk for legal research. The accused enclosed a check for $184, marked as full and final settlement. Hutchinson deemed the accounting inadequate and requested further details. She also returned the check and demanded that the $816 be returned to the accused's trust account, because it was in dispute.

In April 1994, the accused sent Murphey a check for $184 with no restrictions. In October 1995, while the Bar's investigation was pending, the accused returned $816 directly to Murphey.

A Local Professional Responsibility Committee investigator interviewed the accused in November 1994. The accused told the investigator that, several months after receiving Murphey's deposit, he had placed the then-remaining funds into his client trust account. The accused could not verify the deposit, however. He also told the investigator that, after receiving Hutchinson's letter, he did not deposit $816 into his trust account as disputed funds, because he did not have the money. Later in the interview, the accused said that he had deposited the $816, but he could not show evidence of such a deposit. The accused explained that he had some funds left over from another case in the trust account that covered Murphey's disputed funds.

The second case that gave rise to disciplinary charges involved another client, Aghamirzadeh, whom Clark had referred to the accused. In February 1994, Aghamirzadeh retained the accused to defend her against a criminal harassment charge that arose out of an altercation between Aghamirzadeh and a Lake Oswego police officer. The accused agreed to charge $125 per hour, and Aghamirzadeh gave the accused a $500 check as a deposit for services. The accused also agreed to research, at no charge unless she decided to file an action, whether Aghamirzadeh could pursue a civil action against the police. A few days later, the accused negotiated Aghamirzadeh's check. He did not deposit the $500 in his trust account. Instead, he spent the money on personal expenses. When he spent the money, the accused knew that he had spent only one hour working on the case.

In March 1994, Aghamirzadeh agreed to file the civil action and signed a complaint and two fee agreements (for the criminal and civil cases). She also gave the accused a check for $2,000 to be applied to both matters. The fee agreement for the civil case provided that the accused's rate was $125 per hour, and that $1,000 would be deposited in the accused's trust account.

Early the next day, Aghamirzadeh left a message for the accused, asking him not to file the civil action. The accused already had cashed the $2,000 check, but had not deposited any of the proceeds in his trust account. Three days

later, the accused deposited $1,000 into his trust account, but kept the remaining $1,000 as earned fees.

Meanwhile, Aghamirzadeh retained a different lawyer to handle both matters. She notified the accused of that fact on March 7, and he agreed to return her files and provide an accounting. The accused sent Aghamirzadeh an accounting, charging her $657.50 for the criminal case and $1,577.50 for the civil case. He returned $265 of the $2,500 already paid. Aghamirzadeh objected to the accounting, and the parties agreed to a fee arbitration.

In January 1995, an arbitrator determined that the accused was entitled to the $657.50 billed for the criminal case. The arbitrator further determined that Aghamirzadeh had agreed to proceed with the civil action and that the accused was entitled to $895, but not $1,577.50, for that case. The accused thereafter refunded $682.50 due to Aghamirzadeh.

As described above, the Bar filed a formal complaint that alleged 12 violations of the Disciplinary Rules, including three counts of conversion of client funds in violation of DR 1-102(A)(3). The trial panel found the accused guilty of seven of those violations, including two incidents of conversion, and determined that the appropriate sanction was disbarment.

The accused does not dispute the trial panel's finding of violations of DR 9-101(A) (failure to deposit client funds in a trust account), DR 2-110(A)(2) (improper withdrawal from employment) or DR 9-101(C)(3) (failure to maintain records of client funds and to account). The evidence in the record leaves no doubt that the accused committed those violations, and we so conclude.

We turn to the conversion allegations. The trial panel found that the accused converted Murphey's $1,000 deposit for "costs and expenses" when he improperly spent it on the services of a research attorney and a secretary and that he converted part of Aghamirazadeh's $500 deposit when he spent it on personal expenses before he had performed legal services for Aghamirazadeh sufficient to earn

the money. The trial panel found that both of those acts violated DR 1-102(A)(3), which provides:

"(A)   It is professional misconduct for a lawyer to:

"\* \* \* \* \*

"(3)   Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

The accused raises two challenges to the trial panel's conclusion that he twice violated DR 1-102(A)(3). The first concerns the trial panel's conclusion that he acted with the requisite intent in each case to support a finding of conversion. In the second, the accused argues that the trial panel failed to consider adequately his mental state as a mitigating factor in recommending an appropriate sanction.

We first consider whether the accused's use of client funds in either the Murphey or the Aghamirzadeh matter amounted to conversion and, if so, whether either use constituted "conduct involving dishonesty" for purposes of finding a violation of DR 1-102(A)(3).

■     Conversion is a civil tort. In *Mustola v. Toddy*, 253 Or 658, 663-64, 456 P2d 1004 (1969), we accepted the definition of conversion found in section 222A of the *Restatement (Second) of Torts* (1965). That section provides

"(1)   Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."[1]

Implicit in that definition is the notion that the converter does not have the legal right to exercise dominion or control over the property. That is not to say, however, that conduct akin to theft is a prerequisite to a finding of conversion. An actor commits conversion if the actor mistakenly believes that he or she is acting legally with respect to the other person's property, *Hemstreet v. Spears*, 282 Or 439, 579 P2d 229

---

[1] The wording of that *Restatement* section includes money within the concept of "a chattel." *See Hemstreet v. Spears*, 282 Or 439, 444, 579 P2d 229 (1978) (applying definition in *Restatement* and, without discussion, finding defendant employee guilty of converting money by writing checks on company account and depositing them in personal account).

(1978), and even if the actor innocently acquires the property from a knowing converter. *Fredeen v. Stride*, 269 Or 369, 525 P2d 166 (1974). As Justice Lent explained in a concurring opinion in *In re Smith*, 292 Or 84, 102, 636 P2d 923 (1981), "[i]n character or degree, conversion may occur on a spectrum from the most outright, blatant kind of theft to what may be regarded as innocent conversion."

■      Given the range of conduct that falls under the label "conversion," it is apparent that simply finding that a lawyer is guilty of conversion does not lead inevitably to the conclusion that the lawyer engaged in "conduct involving dishonesty" in violation of DR 1-102(A)(3). The term "dishonesty" imports with it a notion of knowledge or intentionality. *See In re Eads*, 303 Or 111, 122, 734 P2d 340 (1987) (DR 1-102(A)(3)[2] "contain[s] as an element the culpable commission of certain acts"). Oregon's lawyer discipline cases reflect that distinction. For example, in *In re Mannis*, 295 Or 594, 668 P2d 1224 (1983), the lawyer inadvertently used client funds for personal purposes when, unbeknownst to the lawyer, his employees had deposited client funds in his general account. The court stated that the lawyer's conduct technically amounted to conversion. Nonetheless, the lawyer's act of conversion was not treated as "conduct involving dishonesty" under DR 1-102(A)(3). Similarly, this court held in *In re Holman*, 297 Or 36, 682 P2d 243 (1984), that, when a lawyer engages in conduct amounting to conversion but lacks the cognitive capacity to appreciate the wrongfulness of his acts, whether by reason of mental illness or addiction, the element of intent is negated and there is no violation of DR 1-102(A)(3).

In the same vein, this court has suggested that the requisite intent may be absent if a lawyer's conduct in converting client funds properly can be characterized as merely negligent, as opposed to knowing or intentional. *See, e.g., In re Phelps*, 306 Or 508, 514-15, 760 P2d 1331 (1988) (court

---

[2] At the time that the complaint in *Eads* was filed, the disciplinary rule pertaining to conduct involving dishonesty, fraud, deceit and misrepresentation appeared at *former* DR 1-102(A)(*4*). That rule was identical to what is now DR 1-102(A)(3) and, for convenience, we refer to DR 1-102(A)(3) throughout the opinion whenever the discussion involves the substance of current DR 1-102(A)(3).

found lawyer had violated DR 1-102(A)(3), because it disbelieved his assertion that he did not know, because of his negligent record keeping, that he was withdrawing funds to which he was not entitled); *In re Weidner*, 320 Or 336, 340-41, 883 P2d 1293 (1994) (court found lawyer had violated DR 1-102(A)(3), because it disbelieved his assertion that he did not know that pertinent statutes prohibited him from taking money from an estate's assets without first making and presenting a claim to the probate court).

Finally, in those cases in which this court has found that a lawyer intentionally or knowingly misappropriated a client's property, the court has found a violation of DR 1-102(A)(3) and imposed the sanction of disbarment. *See, e.g., In re Phelps; In re Thomas*, 294 Or 505, 659 P2d 960 (1983); *In re Pierson*, 280 Or 513, 571 P2d 907 (1977) (all so holding).

To summarize, case law teaches that only those acts of conversion that are intentional or knowing, and not merely negligent, unknowing or innocent, constitute "conduct involving dishonesty" in violation of DR 1-102(A)(3). With those parameters in mind, we examine the accused's conduct in the Murphey and Aghamirzadeh matters to determine where on the spectrum that conduct falls.

### The Murphey Matter

As noted, the accused was appointed to represent Murphey on a *pro bono* basis. Murphey gave the accused $1,000 for costs and expenses. The accused did not prepare an agreement setting forth the purposes for which the funds were to be used. He also did not deposit the money in a client trust account but, instead, placed the money in an envelope and made notations on it as the funds were spent. The evidence establishes that the accused spent most of the money to pay for the services of a law clerk and of Clark, who acted both as a lawyer, performing legal research, and as a secretary for the accused. None of Murphey's money was expended for purposes unrelated to her case.

The trial panel found that the accused converted Murphey's money and concluded that the conversion was a dishonest act for purposes of DR 1-102(A)(3). The panel

stated that, in a *pro bono* case such as the Murphey matter, a deposit for "costs and expenses"

> "[t]raditionally * * * includes an attorney's out-of-pocket expenses such as filing fees, parking, long distance telephone expenses and copying charges. 'Costs and expenses' do not include attorney's fees, nor do they include a lawyer's normal overhead such as secretarial salaries or other staff expenses."

The trial panel found that, although the accused genuinely believed that he was entitled to spend Murphey's money on Clark's and the law clerk's services, such expenditures do not constitute " 'costs and expenses' as those terms are traditionally understood." According to the trial panel, the accused's conduct therefore amounted to intentional conversion, because the accused consciously knew of the nature of the funds involved and intended to exercise dominion and control over them. Moreover, the trial panel concluded that the accused's conduct in converting the funds in that manner "lies closer to theft than innocent conversion and, thus, constitutes a 'dishonest act' for purposes of DR 1-102(A)(3)."

The Bar agrees with the conclusions of the trial panel with regard to the Murphey matter, and calls our attention to another piece of evidence not noted by the trial panel, which it claims further supports those conclusions. The accused testified that Murphey signed a contingency retainer agreement that defined "expenses" to include such items as telephone charges, copies, expert fees, and deposition costs, and that provided that all or a portion of Murphey's case could be assigned to other attorneys at the attorney's own expense and that the attorney reserved the right to use paralegals.

We agree with the trial panel that the evidence in the record establishes that the accused genuinely believed that he was entitled to spend Murphey's money on Clark's and the law clerk's services. Moreover, neither the trial panel nor the Bar references a source of law, other than "tradition," for the proposition that such expenditures are improper. As for the contingency agreement referenced by the Bar, the exhibit copy is unsigned and undated, and Murphey herself

testified that she never signed any such agreement. Moreover, the wording of that agreement is not so clear that an inexperienced lawyer, as the accused was, could not believe mistakenly that he was entitled to charge the client for secretarial and legal research expenses that he paid out-of-pocket. The Bar has not proved, by clear and convincing evidence, that the accused's conduct in spending Murphey's deposit for secretarial work and legal research was intentional or knowing, rather than merely negligent. Accordingly, we find the accused did not commit conduct involving dishonesty in violation of DR 1-102(A)(3) in the Murphey matter.

### The Aghamirzadeh Matter

In February 1994, Clark referred Aghamirzadeh to the accused. At their initial meeting, Aghamirzadeh gave the accused a check for $500 as a retainer to be applied toward her defense. The accused informed Aghamirzadeh at that time that his hourly rate was $125. Four days later, the accused cashed the check and spent the money on personal expenses. The accused testified that, at the time he did this, he knew he had worked only one hour on Aghamirzadeh's case, but he felt he was entitled to cash the check and spend the money because "work was underway," and that "it was going to be done in the very, very near future."

The trial panel ruled that "a lawyer who appropriates a fee knowing that he has not yet earned it is guilty of conversion and * * * such a conversion is a dishonest act for purposes of DR 1-102(A)(3)." On that basis, the trial panel found that the accused had violated the rule. In so doing, the panel rejected the accused's arguments that (1) he did not know the disciplinary rules prohibit use of client funds before they are earned; (2) he could not have formed the requisite intent to convert Aghamirzadeh's money because of his mental condition, which includes depression, bipolar disorder, and post-traumatic stress disorder; and (3) he is not guilty of converting the money because eventually he earned the fee.

The accused argues to this court that he had an honest claim to Aghamirzadeh's money, insofar as he did not know that he was not entitled to spend the money before it was earned. Therefore, he argues, the Bar has not proved, by

clear and convincing evidence, that his use of Aghamirza-deh's funds constituted intentional misappropriation in violation of DR 1-102(A)(3).

We agree with the trial panel and the Bar that the accused converted Aghamirzadeh's money by spending it for personal expenses before it was earned. That proposition is self-evident and does not require extended discussion. However, as noted above, that act of conversion constitutes "conduct involving dishonesty" in violation of DR 1-102(A)(3) only if it was intentional or knowing, and not merely negligent, unknowing or innocent. Thus, a conclusion that the accused violated the rule requires more than merely finding that the accused intended to spend Aghamirzadeh's money before it was earned. If the accused's claim of ignorance of the rules is entitled to credit, then his conduct would be merely negligent, and not intentional or knowing.

■ In the context of its finding of a violation of DR 1-102(A)(3) with respect to the Murphey matter, the trial panel expressly rejected as improbable the accused's claim that he was unaware of the existence of the disciplinary rules or that they prohibit the types of conduct at issue here. The trial panel implicitly rejected the same argument in the context of the Aghamirzadeh matter. Notwithstanding this court's *de novo* review in a disciplinary proceeding, we normally defer to the trial panel's assessment of credibility, because the panel saw and heard the witnesses. *In re O'Neal,* 297 Or 258, 270, 683 P2d 1352 (1984). In this case, the trial panel's implicit credibility finding comports with our own review of the record. Accordingly, for the reasons that follow, we find that the evidence in this case compels the inference that the accused had the necessary intent to appropriate the funds to himself.

First, although the accused testified that he was unaware of the existence of the Oregon Code of Professional Responsibility at all times relevant to the charge of conversion, we find that position to be patently incredible. On becoming a member of the Bar, the accused, like all lawyers, was required to and did sign an "Oath of Office" in which he swore to observe and abide by the Code of Professional Responsibility and to uphold the laws of Oregon.

Second, we do not credit the accused's claim of ignorance of the rule specifically prohibiting lawyers from spending client money before it is earned. At the time that the accused cashed Aghamirzadeh's check, he clearly knew that client funds must be deposited in a trust account, because he contemporaneously was preparing fee agreements for her to sign in which he agreed to deposit in a trust account funds that he received from her. The same rule that requires client funds to be placed in trust, DR 9-101(A), provides that a lawyer may withdraw funds from the account only "when due." DR 9-101(A)(2). From the accused's awareness of one requirement of DR 9-101(A), we infer that he was aware of the others. Moreover, Aghamirzadeh testified that the accused told her at the initial meeting that he would draw on the $500 as he earned the money.

Under the circumstances, we find that the accused knew that he was not allowed to spend the money before it was earned, and his conduct in so doing constituted an intentional misappropriation of client funds in violation of DR 1-102(A)(3). In light of that conclusion, the fact that the accused eventually earned the fees is irrelevant. *See In re Whipple*, 320 Or 476, 481, 886 P2d 7 (1994) (accused violated DR 1-102(A)(3) by intentionally appropriating a client's funds to his own use when he knew he had not yet earned them).

In finding that the accused intentionally misappropriated Aghamirzadeh's $500, we reject the accused's argument that he lacked the capacity to form an intent to misappropriate client funds because of his mental condition. Assuming that the accused suffers from the various mental conditions that he claims, we find that those conditions never deprived the accused of the ability to appreciate the wrongfulness of his actions. Therefore, those conditions do not negate the element of intent for purposes of finding a violation of the disciplinary rule. *See In re Eads*, 303 Or at 122-23 (rejecting lawyer's argument that, due to his chemical dependency, he did not have the cognitive capacity to appreciate the wrongfulness of his acts, and finding that the lawyer knew what he was doing when he used client money for his own purposes); *In re Biggs*, 318 Or 281, 292, 864 P2d 1310

(1994) (to same effect). The witnesses appearing before the trial panel who had the opportunity to observe the accused during the relevant time period were virtually unanimous in their testimony that the accused did not seem to be mentally impaired. Indeed, Clark, who also was the accused's girl-friend at the time, referred Aghamirzadeh to the accused. She testified that she would not have done so if she had had any indication that the accused was impaired mentally. She also testified that, at all times relevant to his representation of Murphey and Aghamirzadeh the accused was able to appreciate the difference between right and wrong.

### *Sanction*

We next determine the appropriate sanction for the multiple violations of the disciplinary rules in this case. The purpose of lawyer disciplinary proceedings is not to punish the lawyer, but to protect the public and the administration of justice from lawyers who have not discharged, will not dis-charge, or are unlikely properly to discharge their profes-sional duties to clients, the public, the legal system, and the legal profession. American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), 1.1; *In re Bourcier*, 325 Or 429, 437, 939 P2d 604 (1997) (to same effect). In considering the appropriate sanc-tion for the violations found, this court refers to the ABA Standards and to Oregon case law. *In re Whipple*, 320 Or at 488. The court considers the nature of the ethical duty vio-lated, the accused's mental state when the violations were committed, the extent of the actual or potential injury caused by the accused's misconduct, and any mitigating or aggravat-ing circumstances. ABA Standard 3.0; *In re Whipple*, 320 Or at 488.

In this proceeding, we have found that the accused engaged in conduct involving dishonesty by intentionally appropriating client funds to his own use in the Aghamirza-deh matter. We also have found the accused guilty of three violations of DR 9-101(A) (failure to deposit client funds in a trust account) and one violation of DR 9-101(C)(3) (failure to maintain records of client funds and to account). In all of those violations, and in the violation of DR 1 102(A)(3) as

well, the accused violated his duty to his clients not to misuse client funds with which he had been entrusted. ABA Standard 4.1.

Finally, we have found the accused guilty of one violation of DR 2-110(A)(2) (improper withdrawal from employment). With respect to that violation, the accused violated both his duty to the client and to the profession. ABA Standard 7.0.

With respect to all of the violations other than the violation of DR 1-102(A)(3), for which we find the accused's conduct to have been intentional, we find that the accused acted knowingly, that is, with a "conscious awareness of the nature or attendant circumstances of the conduct, but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. Moreover, all of the violations caused actual or potential injuries to the accused's clients.

Drawing together the factors of duty, mental state, and injury, and before examining aggravating and mitigating factors, the ABA Standards provide:

> "4.11  Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client."

> "4.12  Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."

> "7.2  Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system."

As this court has stated on many occasions, a single act of intentional misappropriation of client funds to the lawyer's own use in violation of DR 1-102(A)(3) generally warrants disbarment. *See, e.g., In re Whipple*, 320 Or at 488; *In re Laury*, 300 Or 65, 76, 706 P2d 935 (1985); *see also* ORS 9.527(4) (authorizing disbarment for "willful deceit").

Thus, before considering aggravating or mitigating circumstances, it is clear that, under the ABA Standards and this court's case law, disbarment is the appropriate sanction because of the finding of conversion in violation of DR 1-102(A)(3).

We agree with the trial panel's finding of the following aggravating factors: a dishonest or selfish motive (ABA Standard 9.22(b)); a pattern of misconduct in the handling of trust accounts (ABA Standard 9.22(c)); and multiple offenses (ABA Standard 9.22(d)). We also find the following mitigating factors: the absence of a prior disciplinary record (ABA Standard 9.32(a)); personal or emotional problems (ABA Standard 9.32(c)); and inexperience in the practice of law (ABA Standard 9.32(f)).[3]

Here, the aggravating factors qualitatively outweigh the mitigating factors. Even were it otherwise, however, the appropriate sanction, in light of our finding of intentional misappropriation of client funds and the pertinent case law, is disbarment.

The accused argues that the trial panel failed adequately to consider his mental condition as mitigating factors in recommending a sanction, and urges us to impose a sanction short of disbarment on that ground. However, we already have found that the accused's mental condition did not impair his ability to appreciate the wrongfulness of his conduct so as preclude a finding that he intentionally misappropriated client funds. As we stated in *In re Phelps*, "a lawyer may suffer all the claimed disabilities and may have the greatest of attributes, but if he or she steals funds from a client, the sanction is disbarment." 306 Or at 520. The same is true here.

The accused is disbarred.

---

[3] The trial panel also found as a mitigating factor mental disability (Standard 9.32(i)). We discount that consideration, however, because, as we have noted elsewhere, the accused's mental problems do not appear to have been a cause of his unethical conduct. *See In re Murdock*, 328 Or 18, 29, 960 P2d 1270 (1998) (in order to be given weight as mitigating factor, mental disability at least must be "substantial contributing cause of the offense") (quoting Commentary to Standard 9.32).