Argued and submitted November 2, 2009, accused suspended from practice of law for period of 60 days, commencing 60 days from date of decision May 27, 2010

# In re Complaint as to the Conduct of

## THOMAS J. PETERSON,
*Accused.*

## (OSB Case No. 06-109; SC S056480)

232 P3d 940

Thomas J. Peterson, Eugene, argued the cause and submitted the brief *in propria persona*.

Jeffrey D. Sapiro, Disciplinary Counsel, Oregon State Bar, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating three provisions of the Oregon Rules of Professional Conduct (RPC): RPC 1.15-1(a) (requiring lawyer to account for client funds and to deposit and maintain client funds in trust), RPC 1.15-1(c) (requiring lawyer to withdraw client money only as fees are earned or expenses incurred), and RPC 8.4(a)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation). A trial panel of the Disciplinary Board concluded that the accused had violated the rules as alleged. As a sanction, a majority of the trial panel disbarred the accused. A dissenting member of the trial panel would have suspended the accused for one year and required a two-year period of probation thereafter.

The accused sought review pursuant to ORS 9.536(1) and Bar Rule of Procedure (BR) 10.1. Pursuant to ORS 9.536(2) and BR 10.6, this court reviews a decision of the trial panel *de novo*. On *de novo* review, the Bar has the burden of establishing the accused's misconduct by clear and convincing evidence. BR 5.2. Clear and convincing evidence is evidence establishing that the truth of facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985).

On review, we conclude that the accused violated RPC 1.15-1(a) and RPC 1.15-1(c) as alleged by the Bar. We suspend the accused from the practice of law for 60 days.

## I. FACTUAL BACKGROUND

The accused, a sole practitioner in Eugene, has practiced law in Oregon since 1976 and has no prior disciplinary history. His practice consists primarily of domestic relations and real estate work, some of which is contract work performed for other lawyers. Prior to the Bar's investigation, the accused, who does his own bookkeeping, kept "very spotty records" and did not maintain individual client ledgers. Although the accused did not have very many client trust accounts, he testified that he would put client money that was to be held in trust into a lawyer trust account.

The majority of the violations alleged by the Bar stem from the handling of a $2,000 check from the accused's clients, Frances and Emmet Thomas, that was made payable to "Thomas Peterson, Lawyer Trust Account." The Thomases, a retired couple, had become involved in a boundary dispute with their neighbors, the Heneghans. The Heneghans and the Thomases owned adjoining five-acre parcels and the Thomases had been concerned that the Heneghans were encroaching onto their property. On March 17, 2005, the Thomases contracted with surveyor Dave Wellman to locate the boundary line between the two properties. The survey revealed that a driveway recently built by the Heneghans was actually located on the Thomases' property.

The Thomases then asked Eugene lawyer Laura Parrish, who had assisted them with a prior probate matter, to help them resolve the boundary dispute. Parrish, in turn, contacted the accused, who previously had worked for her on a contract basis and who she knew had experience with real estate issues. There was no written retainer agreement between Parrish and the accused or between the accused and the Thomases. From March 2005 until May 2006, the accused submitted regular bills for his services to Parrish. He billed his work at his contract rate of $70 per hour. Parrish paid the accused out of her office account and then billed the Thomases directly for the accused's services.

The accused took the lead role in working with the Thomases. In September 2005, the Thomases and the Heneghans tentatively agreed to settle their dispute by exchanging equal portions of their five-acre parcels. On September 27, 2005, the accused, the Thomases, and Wellman, met at the Thomases' home to discuss how the Thomases wanted to proceed with the property line adjustment. On October 5, 2005, the Thomases authorized Wellman to go forward with the next round of survey work.

Wellman estimated that his fee for the property line adjustment work would be $2,000. Although the Heneghans and the Thomases had agreed to split payment of Wellman's fee, the Thomases, Parrish, and the accused shared a concern that the Heneghans might not pay their share.

On October 2 or 3, 2005, the accused called the Thomases, expressed a concern about the Heneghans not

paying their half of Wellman's fee, and stated that, if the Thomases put some money towards Wellman's services, he would try to have the Heneghan's attorney, Kate Thompson, put a like amount in reserve. On October 3, 2005, Frances Thomas wrote a check for $2,000 payable to "Thomas Peterson, Lawyer Trust Account." The check contained the notation "Land survey." All parties agree that $1,000 of the money represented payment in full of the accused's fee in performing documentation work to finalize the settlement and that the accused would use the other $1,000 to pay the Thomases' share of Wellman's fee once Wellman completed his work and submitted his bill. However, no contemporaneous writing memorialized the purpose of the payment.

On October 6, 2005, the accused deposited the $2,000 check into his trust account. The next day, the accused wrote a check for himself against his trust account in the sum of $2,000 and deposited that check into his personal checking account.

At that time, the accused was experiencing financial difficulties. He had filed for bankruptcy on June 30, 2005, to prevent foreclosure on his home. Because he had failed to make the August and September payments on the bankruptcy plan, the bankruptcy court had issued a September 23, 2005, order that required that the plan payments be brought current by October 6, 2005. On October 6, 2005, the accused mailed the bankruptcy trustee a personal check for the August and September payments, totaling $3,870.[1] Without the $2,000 from the Thomases, the accused would have had insufficient funds in his checking account to timely make the $3,870 payment.[2]

The Thomases' dispute with the Heneghans did not resolve quickly, and Wellman's fee rose to a greater amount than anticipated. After several disagreements between the Heneghans and the Thomases as to the location of the new

---

[1] Because the bankruptcy trustee did not accept personal checks, the trustee requested dismissal of the accused's bankruptcy petition. The trustee later withdrew that motion once the accused made payment via a cashier's check.

[2] The accused testified that his wife was paid on October 20, and that he could have made arrangements with the bankruptcy trustee to postpone the due date of the $3,870 payment until that time. The Bar responds that the accused's explanation is implausible, noting that the accused needed the funds from his wife's paycheck to make the next payment on the bankruptcy plan.

boundary line, Wellman submitted his bill for $4,690 on June 6, 2006. On June 19, 2006, the accused sent Wellman the Thomases' share of his fee, which he paid by a $1,345 check from the Thomases and a $1,000 check from his trust account.

Because the accused believed that his trust account contained $505, he deposited $500 from his personal account into his trust account to cover the check that he issued to Wellman. However, because the accused had withdrawn $100 from the account on June 9, his $500 deposit only raised the trust account balance to $905. Thus, when Wellman cashed the $1,000 check on July 3, it resulted in a $95 overdraft charge on the accused's trust account. The bank honored the check but notified the Bar of the overdraft. That overdraft notice triggered the Bar's investigation of the accused.

Although the accused submitted his final bill through Parrish's office in May 2006, he continued to perform documentation work on the Thomas matter until June 2007. The documentation work included drafting a property line adjustment, a septic line easement, and a trust deed modification for the Heneghan's property, as well as working with the title company to obtain title insurance for the Thomases' property. The accused did not submit any further bills to the Thomases for that work except for a final bill for $174.66 for out-of-pocket costs advanced.

Throughout the Bar's investigation, the accused has acknowledged that he did not keep proper trust account records or otherwise follow proper bookkeeping procedures. In the accused's first letter to the Bar, he apologized and explained that he had made a mistake in calculating the balance in his trust account because he "improperly withdrew" $100 from the account on June 9. In the accused's second letter to the Bar, he explained his role in the Thomas matter in more detail, stating:

> "[A]fter discussing the matter with Ms. Parrish and Mr. and Mrs. Thomas, it was decided that Mr. and Mrs. Thomas would deposit $2,000 with me, so that I could tell the Heneghan attorney, Kate Thompson, that I had received money for the surveyor and that I assumed that

she would also receive money for the surveyor. Mr. and Mrs. Thomas and I agreed that $1,000 of the sum would go to Mr. Wellman, and $1,000 would go to payment of my attorney fees. I received the $2,000 on October 6, 2006, called Ms. Thompson that day and stated that I had received money for the surveyor and that I assumed she would do the same. I then transferred the $2,000 into my personal account. I did so without confirming the arrangement in writing with Mr. and Mrs. Thomas, and admit that I am at fault for not having done so."

In his third letter, the accused responded to a question from the Bar investigator as to why he had removed the $1,000 intended to pay for Wellman's services:

"I admit that I should not have removed the $1,000 that was to be paid to Mr. Wellman, and am at fault for having done so. In addition, I should have returned $1,000, instead of $500, to the trust account to pay Mr. Wellman. My rationale was that I had earned the remaining $500 from [another client] but had not yet withdrawn those funds from the trust account. I admit that I did not follow proper bookkeeping procedures and am at fault for not having done so."

In his fourth letter to the Bar, the accused further responded to questions regarding the withdrawal of the $1,000 earmarked to as future payment for Wellman services:

"I did not have a pressing need for the money at the time I removed the $1,000 from the Thomas trust account fund that was to be paid to the surveyor. * * * In any event, I cannot justify the withdrawal, and any excuse I would attempt to make would sound forced and hollow. What I did was wrong."

On November 8, 2006, the Bar filed a complaint against the accused; the Bar filed an amended complaint on March 20, 2007. On April 2, 2007, the accused filed an answer to the amended complaint. The accused attached to his answer an affidavit dated January 18, 2007, prepared by his lawyer and signed by the Thomases ("the Thomas affidavit"). In part, the Thomas affidavit states:

"On October 6, 2005, we paid $2,000 to Tom Peterson. $1,000 was a flat fee, fully earned at the time of receipt, paid to Mr. Peterson, in advance, for consultation with Lane County, preparation and filing of documents and

follow-up matters needed to consummate the settlement. Mr. Peterson also agree[d] to assume responsibility for paying, when billed, the sum of $1,000 to Mr. Wellman, the surveyor. We agreed to pay the remainder of our share of the survey cost.

"We expected Mr. Peterson to negotiate our check and use the funds as he chose. We claimed no ownership interest in any of the money once it was paid to Mr. Peterson.

"We understand that Mr. Peterson disbursed to himself the sum of $2,000 shortly after receipt of our $2,000 check and then later paid $1,000 to Mr. Wellman on or about June 19, 2006. This is what we expected him to do. He made these disbursements with our knowledge, consent, permission and approval.

"We didn't ask or expect Mr. Peterson to retain any of the money in his trust account. The entire sum was his, subject only to his agreement to pay Mr. Wellman $1,000 at some later date when Mr. Wellman sent a bill for his services."

The Thomas affidavit is consistent with the accused's testimony at trial. At various points during the hearing and a prehearing deposition, the accused has referred to his obligation to pay Wellman as an "agreement to assume responsibility" of paying Wellman, a "legal obligation," a "moral, if not legal, obligation," and a "contractual obligation." At a prehearing deposition and at the hearing, the accused claimed that he had discussed his agreement with the Thomases to obligate himself to pay $1,000 of Wellman's fee with Laura Parrish and Dave Wellman. However, at the hearing, neither Laura Parrish, Dave Wellman, nor Frances Thomas recalled being told of such an agreement.

Also at the hearing, Frances Thomas testified regarding the accuracy of the affidavit. She first testified that she did not remember anything about Peterson's fee being nonrefundable and fully earned upon receipt. She also testified that the statement that the accused could use the money "as he chose" was not entirely accurate, because she and her husband only had granted "him permission to use it for Dave Wellman and to tidy the loose ends." She further testified that, at the time, she did not really know how the $1,000 for

Wellman would be handled in the interim but that, in retrospect, now that she had talked with the Bar's investigator and understood the purpose of a lawyer trust account, it appeared as though the $1,000 should have been kept in the trust account. Finally, Mrs. Thomas also testified that she was pleased with the accused's work and that he earned the money that he had been paid.

## II. DISCUSSION

The trial panel first found that the accused had violated RPC 1.15-1(a) by failing to keep proper records of client funds between September 2005 and July 2006. In part, RPC 1.15-1(a) requires that a lawyer keep "[c]omplete records" of funds held in a lawyer's trust account for clients or third persons. The accused has acknowledged that, prior to the Bar's investigation, he kept very poor records, failed to maintain individual client ledgers, and failed to reconcile his monthly trust account statements. On review, the accused concedes that he violated the recordkeeping requirements of RPC 1.15-1(a). We accept that concession.

The trial panel also found that the accused's October 2005 withdrawal of the $2,000 violated RPC 1.15-1(a) and RPC 1.15-1(c). In part, RPC 1.15-1(a) requires that

> "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession separate from the lawyer's own property. Funds, including advances for costs and expenses and other funds held for another, shall be kept in a separate 'Lawyer Trust Account' * * *."

RPC 1.15-1(c) requires that

> "[a] lawyer shall deposit into a lawyer trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred."

On review, the accused appears to contest those violations, admitting only that he violated RPC 1.15-1(c) insofar as it would require a written agreement on the facts of this case.

We begin by determining to whom the $2,000 belonged on October 7, 2005, when the accused withdrew the money from his lawyer trust account and deposited it into his

personal account. The Bar argues that $1,000 represented an advance payment of the accused's future attorney fees and thus remained client property until the accused performed the documentation work to earn his fees. The Bar contends that the remaining $1,000 represented "anticipated expenses for the surveyor paid by the Thomases in advance." The accused, relying on the affidavit, contends that the entire $2,000 sum was his property, subject only to his agreement with the Thomases that he would pay the surveyor.

Even assuming that the Thomases and Peterson had an oral agreement that the entire $2,000 sum represented a fully nonrefundable retainer earned on receipt, "an oral agreement does not provide a sufficient basis for a lawyer to treat a client's funds as if they were his or her own." *In re Fadeley*, 342 Or 403, 409-10, 153 P3d 682 (2007) (lawyer violated *former* DR 9-101(A) by depositing client funds into personal checking account rather than lawyer trust account). In the absence of a written fee agreement that expressly designates a fee as a nonrefundable retainer earned upon receipt, funds paid from a client to a lawyer remain subject to trust account rules regarding funds held for another. *In re Biggs*, 318 Or 281, 293, 864 P2d 1310 (1994) (applying *former* DR 9-101(A)); *see also In re Balocca*, 342 Or 279, 288-89, 151 P3d 154 (2007) (following *Biggs*). Applying *Fadeley*, *Biggs*, and *Balocca*, we conclude that the accused violated RPC 1.15-1(a) and (c) when he removed the $2,000 from his lawyer trust account and deposited it into his personal checking account.

Our final inquiry focuses on whether the accused's handling of the $2,000 also violates RPC 8.4(a)(3), as alleged by the Bar. RPC 8.4(a)(3) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law."

Under this court's case law, "dishonesty includes theft or knowing conversion of client property, such as client funds." *In re Eakin*, 334 Or 238, 248, 48 P3d 147 (2002).

 To determine whether an accused lawyer engaged in conduct involving dishonesty by conversion, we apply the two-step analysis from *In re Martin*, 328 Or 177, 184, 970 P2d 638 (1998). We first consider whether the accused's conduct "amounted to conversion." If so, we next evaluate whether the accused exhibited the requisite intent such that the conversion constituted "conduct involving dishonesty."[3]

An individual commits the act of conversion when, without the legal right to do so, he or she exercises " 'dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.' " *Id.* (quoting definition found in *Restatement (Second) of Torts* § 222A (1965)).

 Because an actor who mistakenly believes that his or her conduct is legal still can commit conversion, not all conversions implicate the prohibition in RPC 8.4(a)(3) against "conduct involving dishonesty." *Id.* at 184-85. Acts of conversion that are "intentional or knowing" violate RPC 8.4(a)(3); acts that are "merely negligent, unknowing or innocent" do not. *Id.* at 186. Stated differently, the Bar must prove, by clear and convincing evidence, that the accused either (1) intended to convert property, or (2) knew "that his conduct was culpable in some respect." *In re Skagen*, 342 Or 183, 203, 149 P3d 1171 (2006) (evaluating the mental state required for "conduct involving dishonesty" under *former* DR 1-102(A)(3)).

As discussed above, there was no written agreement between the accused and the Thomases that authorized the accused to withdraw or spend the $2,000. The affidavit signed by the Thomases is not the equivalent of a contemporaneously signed written fee agreement. The conduct in question, however, is not in dispute: the accused withdrew

---

[3] The analysis from *In re Martin* was developed for substantially identical *former* DR 1-102(A)(3), which provided that "[i]t is professional misconduct for a lawyer to: * * * (3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation." We consider the analysis in *Martin* equally applicable to alleged violations of RPC 8.4(a)(3).

$2,000 from his trust account, deposited the funds in his personal account, and used the funds for his own personal purposes. That conduct *could* constitute conversion. We need not decide that issue, however, because, as we shall explain, we conclude that the Bar has failed to prove that the accused's state of mind was a culpable one.

The Bar points to a number of circumstances surrounding the accused's withdrawal of the $2,000 that the Bar contends demonstrate that his conduct was culpable rather than innocent. The Bar begins with the circumstances surrounding the accused's request for the $2,000, namely that: (1) prior to October 2005, the accused only had billed the Thomases indirectly through Parrish, (2) the accused did not list the $2,000 as a credit on his November billing statement to Parrish or tell her about the payment, and (3) because the Thomases were current on their payments to Parrish, the accused had no reason to ask for the money except to satisfy his own financial needs.

In addition, the Bar contends that the accused's handling of the $2,000 indirectly demonstrates his knowledge that the money did not belong to him. The Bar argues that the accused's initial deposit of the $2,000 into his trust account reflects his knowledge that the $2,000 was client property that should remain in trust. *See In re Hedges*, 313 Or 618, 623, 836 P2d 119 (1992) (money paid by client to lawyer remained client funds in the absence of a contrary written agreement when the accused had deposited money in trust account and admitted that, if the money had been a nonrefundable fixed fee, he would have deposited it in his office account). The Bar also points out that the accused issued the check used to pay Wellman $1,000 from his trust account.

Next, the Bar points to the accused's correspondence during the Bar's investigation. The Bar explains that the accused did not assert the explanation that the entire $2,000 was a flat fee earned upon receipt in his correspondence with the Bar. The Bar also notes that, in his correspondence with the Bar, the accused admitted that he "should not have" withdrawn the $1,000 to be paid to the surveyor and that such action "was wrong."

Finally, the Bar contends that the accused has been dishonest and, accordingly, his explanations are not entitled

to any weight. The Bar argues that the accused lied in a deposition by stating that he did not have any pressing need for money in October 2005. Moreover, the Bar notes, although the accused testified that he had personally obligated himself to pay Wellman and discussed that obligation with Parrish, the Thomases, and Wellman, none of those persons corroborated that story.

The accused makes several points in response to the Bar's characterization of the evidence. As to the timing of his request, the accused responds that, in October 2005, the settlement and survey were both moving forward, and that the request was made in response to the shared concern that the Heneghans would not pay their share of the surveyor's bill. He also argues that the payment was sought because the matter was moving forward such that he had transitioned from the initial phase of his work (billed through Laura Parrish at a rate of $70 per hour) to the documentation phase (billed through the $1,000 flat fee payment). With regard to his correspondence with the Bar, the accused responds that his statements were focused on his failure to memorialize the agreement in writing and thus do not properly support the conclusion that he was admitting to a knowing or intentional conversion of client funds. With regard to his financial circumstances, the accused contends that he did not need the Thomas payment to make his bankruptcy payments because his wife was paid on October 20 and he could have obtained an extension of time from the trustee until that date. Finally, the accused responds that, as he testified at trial, the reason he paid the surveyor from his trust account was because he did not have a business account and he wanted the payment to look professional.

We find it helpful to consider the $1,000 intended for the accused's services separately from the $1,000 intended for payment to Wellman. With regard to the $1,000 earmarked as payment for the accused's services, we find that the Bar failed to prove by clear and convincing evidence that the accused acted with culpable intent. Below, we discuss three sets of facts that could lead to objectively reasonable inferences that the accused intentionally or knowingly converted the funds and explain why those facts, taken in light of the circumstances of the case, are insufficient to meet the standard of clear and convincing evidence.

■ First, the accused directed Frances Thomas to make the $2,000 check payable to his lawyer trust account and then deposited the check into his trust account. That fact suggests that the accused may have known that the $1,000 in attorney fees belonged in trust because the accused testified that, when he had client money that belonged in trust, his practice was to deposit that money into a trust account. However, it is also undisputed that, in October 2005, the accused was using poor bookkeeping and trust account practices. Thus, the deposit of the funds into his trust account does not, standing alone, prove by clear and convincing evidence that the accused knowingly misappropriated funds in this case. *See In re Wyllie*, 331 Or 606, 621, 19 P3d 338 (2001) (Bar's argument that, because the accused generally lacked appropriate procedures for handling client funds, the accused knowingly misappropriated client funds "proves too much").

Second, the accused never noted a credit on his billing to Laura Parrish that reflected the $2,000 payment received from the Thomases. However, by October 2005, the accused had taken the lead on the Thomas matter and Parrish was no longer directly involved. Parrish testified that, although she was not aware of the agreement between the accused and the Thomases, she would not have objected. Moreover, although the accused submitted his last billing statement to Parrish on May 31, 2006, he continued to perform documentation work on the Thomas matter until June 2007 without submitting any further billing, except a final bill for costs advanced.

Third, when the accused approached the Thomases and requested the $2,000, it was the first time that he had directly contacted the Thomases regarding billing or fees. One plausible explanation for the accused's request is that he was seeking funds to make the back payments on his bankruptcy plan to avoid dismissal. But, an at least equally plausible explanation is that the timing of the request corresponded with the negotiation of a tentative settlement agreement and the beginning of the surveyor's work on the property line adjustment. We are unpersuaded that the Bar proved by clear and convincing evidence that the accused had no legitimate reason to ask for the $2,000 advance payment. *See In re Claussen*, 331 Or 252, 267, 14 P3d 586 (2000) ("The

facts are capable of supporting either party's view, but the evidence in the record does not permit us to infer that the alleged violations are 'highly probable.' ").

■ Taken together, the above-described evidence certainly raises the question whether the accused knew that the $1,000 was client funds and not available for disbursement until all work was performed. However, this court's standard of review of clear and convincing evidence "demands more than merely a suspicion that a particular fact is true." *In re Albrecht*, 333 Or 520, 539, 42 P3d 887 (2002). We find that the Bar did not prove that the accused violated RPC 8.4(a)(3) in his handling of the $1,000 that had been earmarked as payment for his attorney fees.

We turn to the $1,000 that the clients had advanced for payment of the surveyor. The accused has consistently acknowledged that he received the $1,000 from the Thomases for the purpose of paying the surveyor, Wellman. The question, however, is whether the accused knew that his withdrawal and application of the $1,000 was inconsistent with the authority that the clients had given him.

The Bar stresses that the $1,000 in question was meant solely to compensate Wellman, not the accused. The Bar also points out that the accused, in correspondence with the Bar, acknowledged that he "should not have" withdrawn the $1,000 and that that action "was wrong."

As we have already discussed, the accused's acknowledgements that, viewed in retrospect, his conduct was improper in some ways are not specific enough to serve as admissions that he committed a conversion of client funds. However, the lack of specificity in his statements is not the most serious evidentiary problem that we detect in this record.

We find that the accused did believe that he had a binding obligation to the client to pay the surveyor, and that he always intended to act consistently with that obligation, as he understood it. The parties differ sharply, however, in their portrayals of the evidence of the authority that the accused received from the Thomases regarding the money in question. The Bar relies on the testimony of Frances Thomas,

summarized above, that the money was for Wellman's bill and that she had realized, after speaking with the Bar's investigator, that the accused should have kept the money in the trust account. The Bar also criticizes the accused's credibility and points out that Parrish, Wellman, and Frances Thomas could not recall being told of the agreement that the accused described.

According to the accused, his withdrawal of the $1,000 was consistent with his understanding with the Thomases and, therefore, he was not acting dishonestly in making the withdrawal. The affidavit signed by the Thomases explicitly corroborates the accused's explanation of his authority regarding the $1,000.[4] Even if we disregard the accused's testimony about his authority, as the Bar urges, there remains a significant evidentiary conflict about what the accused was authorized to do with the money that he received from the Thomases. The fact that Frances Thomas later acquired a different understanding of the Bar's rules pertaining to trust accounts from the Bar's investigator does not alter the affidavit's portrayal of the accused's authority on October 7, 2005. The Bar focuses on the fact that Frances Thomas expressed embarrassment for signing the affidavit "without really studying it." However, she also testified that she read the affidavit, without time constraint, before she

---

[4] To repeat, the Thomases swore that the following facts were true in their affidavit:

"Mr. Peterson also agree[d] to assume responsibility for paying when billed, the sum of $1,000 to Mr. Wellman, the surveyor. We agreed to pay the remainder of our share of the survey cost.

"We expected Mr. Peterson to negotiate our check and use the funds as he chose. We claimed no ownership interest in any of the money once it was paid to Mr. Peterson.

"We understand that Mr. Peterson disbursed to himself the sum of $2,000 shortly after receipt of our $2,000 check and then later paid $1,000 to Mr. Wellman on or about June 19, 2006. This is what we expected him to do. He made these disbursements with our knowledge, consent, permission and approval.

"We didn't ask or expect Mr. Peterson to retain any of the money in his trust account. The entire sum was his, subject only to his agreement to pay Mr. Wellman $1,000 at some later date when Mr. Wellman sent a bill for his services."

At the trial panel hearing, Frances Thomas gave testimony in response to questions about the foregoing affidavit. Neither party called Emmet Thomas as a witness at the hearing.

signed it in her home. Those differing accounts contribute to our conclusion that the evidence is in conflict regarding the authority delegated to the accused. Even if the court could view Frances Thomas' testimony as expressing second thoughts about the accuracy of the affidavit, she did not repudiate the affidavit and said nothing to indicate that Emmet Thomas disavowed his statements in the affidavit. Additionally, as the accused points out, it is uncontradicted that the Thomases were pleased with the accused's services and that he timely paid Wellman's bill upon receipt.

As noted, the Bar bears the burden to prove, by clear and convincing evidence, that the accused had a culpable state of mind and, thus, acted dishonestly when he withdrew the funds from his trust account and applied them to his own purposes.[5] Even if we disregard the accused's testimony entirely, the evidentiary conflict to which we have adverted causes us to be unpersuaded, by clear and convincing evidence, that the accused intentionally or knowingly withdrew and applied the $1,000 in violation of his authority. We must resolve the resulting evidentiary question against the party who bears the burden of proof on the question. Consequently, we conclude that the Bar has not proven the charge of conversion involving dishonesty, in violation of RPC 8.4(a)(3), regarding the $1,000 payment for the surveyor's services.

### III. SANCTION

Having found that the accused violated RPC 1.15-1(a) and RPC 1.15-1(c), we next determine the appropriate sanction. This court has recognized that the purpose of lawyer discipline is not retribution but rather to "protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." American Bar Association's *Standards for Imposing Lawyer Sanctions* 1.1

---

[5] Indeed, intent is the distinguishing characteristic between failure to maintain client funds in a trust account under RPC 1.15-1(a) and conversion involving dishonesty under RPC 8.4(a)(3). *See In re Phelps*, 306 Or 508, 512, 760 P2d 1331 (1988) (Under former disciplinary rules, "[a] lawyer may remove money from a trust account * * * before intentionally appropriating that money for the lawyer's own purposes * * * but removal of money from a trust account does not necessarily constitute an intentional misappropriation.").

(1991) (amended 1992) (ABA Standards); *see In re Paulson*, 346 Or 676, 712, 216 P3d 859 (2009), *adh'd to as modified on recons*, 347 Or 529, 225 P3d 41 (2010) (The purpose of lawyer discipline is not to punish a lawyer who has failed to follow the rules of professional conduct.). To determine the appropriate sanction, we follow a three-step analytical framework. First, "we determine an initial presumptive sanction based on (1) the ethical duty violated; (2) the lawyer's mental state; and (3) the actual or potential injury caused" by the lawyer's conduct. *Paulson*, 346 Or at 712 (citation omitted). Second, we adjust the presumptive sanction based on the presence of aggravating or mitigating circumstances. *Id.* Third and finally, we consider whether that adjusted sanction is consistent with Oregon case law. *Id.*

A. *Preliminary analysis*

In violating RPC 1.15-1(a) and RPC 1.15-1(c), the accused has violated his duty to his clients to deal properly with client property and avoid potential injury to the clients' interests. ABA Standard 4.12. Those violations also violate the accused's duty to the public to avoid conduct that reflects adversely on his fitness to practice law. ABA Standard 5.14.

The ABA Standards describe three types of culpable mental states: intent, knowledge, and negligence. A lawyer acts intentionally when the lawyer acts with "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. A lawyer acts knowingly when the lawyer acts with "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* In turn, a lawyer acts negligently when the lawyer deviates from the standard of care that a reasonable lawyer would exercise in the situation by failing to heed a substantial risk that circumstances exist or that a result will follow. *Id.* We find that the accused acted negligently when he committed the trust account violations. From his lengthy experience in the practice of law, the accused knew or should have known that his handling of his trust account funds was improper.

An injury to a client's interests can be actual or potential. Here, we find that the accused caused potential economic injury to his clients because his poor accounting

methods jeopardized the security of trust account deposits. By failing to maintain his trust accounts in accordance with legal requirements, the accused also caused actual harm to the legal profession. In cases involving a failure to observe trust account requirements, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." ABA Standard 4.12. In this case, the presumptive sanction is a suspension.

B. *Aggravating and mitigating circumstances*

We next turn to a consideration of aggravating and mitigating circumstances. We find two aggravating circumstances. First, the accused committed multiple offenses in this case. ABA Standard 9.22(d). Second, having practiced law in Oregon since 1976, the accused has substantial experience in the practice of law. ABA Standard 9.22(i).

Two mitigating circumstances also are present. The accused lacks any prior disciplinary record. ABA Standard 9.32(a). The accused also appears to have an excellent reputation in the community. ABA Standard 9.32(g).

C. *Oregon case law*

We turn to a consideration of whether the presumptive sanction is consistent with Oregon case law. Four recent cases are pertinent to this discussion.

In *Fadeley*, the accused lawyer had no written fee agreement with his client. He received a $10,000 deposit from the client and deposited it in his personal checking account. The lawyer and client disagreed about whether the money constituted, as the lawyer claimed, a fee fully earned on receipt. The Bar alleged four violations: (1) failure to deposit client funds in a trust account, DR 9-101(A); (2) failure to render an accounting, DR 9-101(C)(3); (3) charging or collecting a clearly excessive fee, DR 2-106(A); and (4) failure to promptly refund an unearned fee, DR 2-110(A)(3). The court in *Fadeley* found that the lawyer committed the violations with a mental state of negligence; it also found that the aggravating circumstances outweighed the mitigating circumstances. The court imposed a 30-day suspension.

In *Eakin*, the accused lawyer and the client agreed on a flat fee of $3,500 to pay for services and a trust account deposit by the client of $3,000 to pay for costs. The lawyer mishandled the client trust account by reimbursing herself $850 for an expense that she did not incur, thus paying herself more than she was entitled to receive. The court sustained charges against the lawyer under DR 9-101(A), (C)(3), and (C)(4), all of which obligate a lawyer to properly administer client funds in a trust account. The court determined that the sole aggravating circumstance, substantial experience in the practice of law, outweighed the two mitigating circumstances present. The court found that the lawyer should have known that she was mishandling her trust account. The court ordered a suspension of 60 days.

In *Balocca*, the accused lawyer produced no written agreement regarding fees with the client. The lawyer received the client's partial payment toward fees and costs, but he did not deposit the funds into a trust account. The court sustained charges of improper trust account administration under DR 9-101(A) and DR 9-101(C), as well as a charge under DR 2-106(A) for charging or collecting an excessive fee. The court determined that the accused lawyer knew or should have known that his handling of client funds was improper, and that there were four aggravating circumstances and no mitigating circumstances. The court imposed a suspension of 90 days.

Finally, in *Wyllie*, the accused lawyer had no written fee agreement with the client. He collected $750 from the client and deposited the money in a personal account, claiming that he had earned that amount. The court sustained charges that the lawyer had failed to deposit and maintain client funds in a trust account, as well as other charges that the lawyer charged or collected an excessive fee, DR 2-106(A), DR 9-101(A); and had a conflict of interest. The court found that the lawyer's mental state for the trust account violations was negligence under DR 5-105(E), and that there were several aggravating circumstances but no mitigating circumstances. The court imposed a sanction of a four-month suspension.

Our review of the foregoing Oregon cases, and others, leads us to conclude that the presumptive sanction that

we identified earlier, a suspension, is the appropriate sanction in this case. In determining the length of the suspension, we draw particular attention, as did the court in *Eakin*, to the accused's substantial experience in the practice of law. The failure of a lawyer with substantial experience to carry out fully the responsibilities imposed by RPC 1.15-1(a) and RPC 1.15-1(c) for the protection of client funds in a lawyer trust account is a serious deviation from the legal profession's ethics. Under the circumstances shown here, that aggravating circumstance outweighs his unblemished prior disciplinary record and good reputation in the community. The Bar's proved charges require that the accused be suspended for 60 days.

The accused is suspended from the practice of law for a period of 60 days, commencing 60 days from the date of this decision.