PER CURIAM
**615 The Oregon State Bar charged respondent with multiple violations of the Oregon *66 Rules of Professional Conduct (RPC), which he allegedly committed while representing three clients: Prado-Hernandez, Monroy, and Lyons. A trial panel of the Disciplinary Board found that respondent had committed most but not all the charged violations. Essentially, the trial panel found that respondent had improperly handled his client's funds, failed to adequately communicate with his clients, and improperly retained client funds. Based on those violations, the trial panel suspended respondent from the practice of law for a year.
On review, respondent concedes some violations but challenges others. He also argues that his misconduct warrants a reprimand or, at most, a brief suspension. The Bar, for its part, argues that the trial panel should have found that respondent committed additional violations and that a two-year suspension is appropriate. We review the trial panel's findings de novo . ORS 9.536(2) ; Bar Rule of Procedure (BR) 10.6. The Bar has the burden of proving misconduct by clear and convincing evidence. BR 5.2. As explained below, we agree with most of the trial panel's findings but conclude that respondent should be suspended from the practice of law for 18 months. We address the charged violations regarding each client separately.
I. PRADO-HERNANDEZ
Prado-Hernandez pleaded guilty to first-degree sexual abuse. After his conviction became final, Prado-Hernandez's wife asked respondent to represent her husband in seeking post-conviction relief.[1] Specifically, she wanted respondent to investigate whether there were grounds for post-conviction relief and, if so, to file and pursue a post-conviction petition.
Respondent agreed to represent Prado-Hernandez for a flat fee of $5,000 plus expenses. Respondent collected the $5,000 from the wife on July 13, 2010, and deposited those funds into his operating account rather than his **616 lawyer trust account. After depositing the funds, respondent prepared a written fee agreement stating that he was being retained for a "flat fee of $5,000.00 to investigate post-conviction remedies and to represent Client if a [post-conviction] petition is filed." As a result of various mishaps on respondent's part, Prado-Hernandez never saw, much less signed, the written fee agreement. However, respondent testified that he discussed the terms of the written agreement with Prado-Hernandez.
Over the next year, respondent investigated potential grounds for seeking post-conviction relief but concluded that no valid basis for relief existed. On September 14, 2011, respondent mailed a letter to Prado-Hernandez explaining his conclusion. The letter begins by noting, "I've completed my investigation of your case. * * * My opinion at this time, based on everything I have seen and heard, is that I don't believe there are any grounds for post-conviction relief." After a detailed description of the facts of the case, the letter reiterated that respondent did not "think there are any legitimate grounds for post-conviction relief." The letter concluded: "I know this is not what you want to hear but I just don't see any basis for relief. That is not to say that I will stop my investigation. I will continue to look for options to getting your case back to court."
In January 2013, approximately 16 months after respondent mailed the September 2011 letter, Prado-Hernandez's wife began contacting respondent to ask about the status of the case. In May 2013, respondent told Prado-Hernandez's wife that he would meet with her husband at the Snake River Correctional Institution, where Prado-Hernandez was incarcerated. Respondent planned a meeting for later that month but had to cancel because he had scheduling conflicts. Another meeting was planned for October 2013, but it was cancelled at the request of Prado-Hernandez's family when it looked like Prado-Hernandez might be transferred to a closer prison.
On December 2, 2013, Prado-Hernandez sent a letter to respondent complaining about respondent's inaction and requesting "copies of the most recent court filings * * *, a list of everything you have filed for me, a summary of the **617 actions you have taken, and an update on the current status of the case, *67 together with an outline of your future plans." Respondent wrote back that he had received the letter, was busy with a trial, and would be out of the office over the holidays. He added that he would provide a more complete response when he returned to the office on January 2, 2014.
Respondent never sent the promised response. In the meantime, Prado-Hernandez requested copies of filings directly from the Court of Appeals and the trial court and learned that respondent had not filed anything.
In February 2014, Prado-Hernandez filed a complaint with the Bar. After receiving notice of the bar complaint, respondent met with Prado-Hernandez in March 2014. Following that meeting, respondent sent Prado-Hernandez a letter stating that he "would like the opportunity to continue exploring options and to continue to work with you in attempting to overturn your plea and sentence. This will entail thinking and working outside the box." Respondent agreed to perform several tasks noted in the letter, including:
"Review and provide billing statements accounting for charged fees and expenses and costs charged to date;
"Provide a partial refund based on statements and costs and expenses;
"Provide you a copy of the file;
"Conduct investigation of case and interview witnesses at no additional charge; [and]
"Report on status of investigation within 60 days from March 25, 2014."
Respondent scheduled a meeting with Prado-Hernandez for May 2014 to follow up on his letter. Prado-Hernandez, however, refused to see respondent and told the Bar that he wanted a refund of the money that his wife had paid respondent. Respondent never refunded the money to Prado-Hernandez, nor did he provide him with the information, such as copies of billing statements, that he had promised.
**618 The Bar charged respondent with violating six rules of professional conduct. The trial panel found that he had violated four rules. It found that respondent violated: RPC 1.4(a) when he failed to respond to reasonable requests from Prado-Hernandez and his wife beginning in 2013 regarding the status of the post-conviction petition; RPC 1.15-1(a) and RPC 1.15-1(c) when respondent deposited the funds that he received from Prado-Hernandez's wife in his operating account before he earned them and without having obtained a signed "earned on receipt" agreement; and RPC 1.15-1(d) when he failed to render a full accounting regarding his fees and costs. However, the trial panel did not find, as the Bar had charged, that respondent had violated RPC 1.15-1(d) by retaining unearned funds.
Respondent concedes that he violated RPC 1.15-1(a) and RPC 1.15-1(c) when he deposited the $5,000 into his operating account "[w]ithout a clear written agreement * * * that the fees paid in advance constitute a non-refundable retainer earned on receipt," In re Biggs , 318 Or. 281, 293, 864 P.2d 1310 (1994),[2] and we do not discuss those rule violations further. Respondent argues, however, that the trial panel erred in finding that he violated RPC 1.4(a) by failing to respond to Prado-Hernandez's reasonable requests for information and RPC 1.15-1(d) by failing to provide an accounting. The Bar, for its part, argues that the trial panel erred in finding that there were no unearned funds for respondent to refund and thus no additional violation of RPC 1.15-1(d).[3] We turn to those issues.
*68 A. RPC 1.4(a)
RPC 1.4(a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and **619 promptly comply with reasonable requests for information." Respondent argues that, because Prado-Hernandez received his September 2011 letter explaining that he could find no valid basis for filing a post-conviction petition, there was no reason for respondent to immediately answer the 2013 inquiries from Prado-Hernandez and his wife regarding the status of the case. Additionally, respondent argued for the first time at oral argument that he had no obligation to respond to Prado-Hernandez's wife because she was not his client.
We assume, for the purposes of resolving this issue, that RPC 1.4(a) required respondent to discuss the status of the case only with his client. Accordingly, we assume that his failure to respond directly to Prado-Hernandez's wife does not provide a basis for finding a rule violation. However, we infer from the fact that respondent agreed to meet with Prado-Hernandez in May 2013 that respondent understood, at least by May 2013, that Prado-Hernandez's wife was acting on her husband's behalf in asking respondent about the status of his case.
We also conclude that Prado-Hernandez's requests for information, communicated both through his wife and directly by him, were reasonable ones. Although respondent wrote Prado-Hernandez in September 2011 that he did not see a valid basis for post-conviction relief, he also stated in his letter, "I will not stop my investigation. I will continue to look for options to getting your case back to court." Even if we assume, as respondent argues, that Prado-Hernandez received that letter, Prado-Hernandez reasonably understood from the letter that respondent was continuing to work on his behalf, and Prado-Hernandez reasonably asked through his wife what, if anything, respondent was doing to advance his claims.
Despite receiving those reasonable requests for information on or before May 2013, respondent did not tell Prado-Hernandez the status of the case for at least nine months. Specifically, respondent did not provide a substantive response to Prado-Hernandez's inquiries until March 2014, approximately one month after Prado-Hernandez filed a bar complaint against respondent and more than **620 nine months after respondent understood that Prado-Hernandez's wife was asking on her husband's behalf for information about his case. Respondent violated RPC 1.4(a) by not providing a prompt response to a reasonable request for information.
B. RPC 1.15-1(d)
RPC 1.15-1(d) provides:
"Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."
RPC 1.15-1(d). The trial panel found that respondent did not retain any unearned funds in violation of that rule. However, it found that he violated that rule by not providing Prado-Hernandez with a full accounting after Prado-Hernandez requested one. The Bar challenges the first finding; respondent, the second.
We begin with the issue that the Bar raises-whether respondent violated RPC 1.15-1(d) by retaining any unearned funds after Prado-Hernandez terminated his representation. Respondent argues that, in return for a flat fee of $5,000, he agreed to investigate and pursue, if warranted, post-conviction relief. In respondent's view, once he investigated the possibility of filing a post-conviction petition and concluded that no petition was warranted, he had done all that the agreement required to earn the entire fee. For that reason, respondent argues, the trial panel correctly determined that he held no unearned fees that he was obligated to return.
The Bar responds that the limited amount of work that respondent did on Prado-Hernandez's *69 behalf was insufficient to justify the full $5,000 fee. The Bar never explains why that is so, however. Specifically, the Bar never explains what, in its view, the terms of the agreement between respondent and Prado-Hernandez were or **621 why, if there were a flat-fee agreement, respondent failed to earn the full amount of the fee. In our view, it is necessary to determine what respondent agreed to do to earn his fee before determining whether respondent did all that he promised to do.
As noted above, the agreement between respondent and Prado-Hernandez was oral. Although respondent had prepared a written fee agreement and testified that he discussed the terms of that agreement with Prado-Hernandez, Prado-Hernandez never saw the written agreement. The testimony at the hearing, however, made clear that respondent and Prado-Hernandez orally entered into a flat-fee agreement. The testimony is less clear as to what respondent promised to do to earn the flat fee. There is evidence to support respondent's position that he would earn the flat fee if he investigated whether there was a legitimate basis for filing a post-conviction petition and, if there were none, took no further action.[4] There is also evidence that cuts the other direction-specifically, respondent's March 2014 letter to Prado-Hernandez in which he agreed to "[p]rovide a partial refund based on statements and costs and expenses."
If respondent had the burden of proving that he did all he promised to do to earn the $5,000 flat fee, we might question whether he met his burden of persuasion. However, the Bar had the burden of proving by clear and convincing evidence that the fees respondent retained were unearned-namely, that respondent did not do all that he promised to do to earn the fees. Cf. In re Balocca , 342 Or 279, 292-93, 151 P.3d 154 (2007) (holding that a lawyer violated a former ethical rule requiring the lawyer to refund unearned fees because clear and convincing evidence established that the parties had entered into a flat-fee agreement and that the lawyer had not done all the agreement required to earn the fee).[5] The Bar did not satisfy that burden. In reaching **622 that conclusion, we recognize that respondent's statement in his March 14, 2014 letter that he would provide a partial refund cuts in the Bar's favor. However, that statement appears to be more an offer of compromise in response to Prado-Hernandez's bar complaint than a description of their underlying fee agreement, and we note that the Bar mentions that letter only in passing. On the other side of the ledger, respondent's testimony describing his flat-fee agreement with Prado-Hernandez supports the view that that he earned the entire flat fee. Given this record, we are not persuaded by clear and convincing evidence, as the trial panel was not persuaded, that respondent retained unearned fees in violation of RPC 1.15-1(d).[6]
We turn next to respondent's argument that he had no obligation under RPC 1.15-1(d) to provide a full accounting. On that issue, respondent does not dispute that Prado-Hernandez requested an accounting and that he did not provide one. Respondent argues instead that the obligation to provide a full accounting applies only to "funds * * * in which a client or third party has an interest," and he asserts, without further explanation, *70 that there is no evidence that he ever received such funds. Alternatively, he acknowledges that, to the extent the $5,000 advance fee he received from Prado-Hernandez's wife constituted funds in which his "client * * * ha[d] an interest," any failure to provide an accounting flowed from his mistaken belief that those funds were earned on receipt and no additional sanction should be imposed for the RPC 1.15-1(d) violation. Without a more cogent explanation as to why the trial panel erred, we decline to disturb its ruling. Cf. **623 State v. Moore , 361 Or. 205, 211 n. 2, 390 P.3d 1010 (2017) (limiting analysis to issues that had been sufficiently developed).[7]
II. MONROY
The Bar charged respondent with multiple rule violations for his representation of another client, Monroy. On appeal, respondent argues that claim preclusion prevents the Bar from pursuing some or all of the charges arising out of his representation of Monroy. If that defense is not successful, respondent concedes that he violated some of the charged rules but argues that the trial panel erred in finding other rule violations.
In setting out the facts, we first describe respondent's representation of Monroy and his transfer of Monroy's files to another lawyer, Kliewer, which occurred when respondent was suspended from the practice of law. We then turn to respondent's claim preclusion defense and set out the facts that relate to that defense-both the charges that came to light when respondent transferred his files to Kliewer and the stipulated order of discipline resolving those charges. After explaining why we agree with the trial panel that claim preclusion does not apply, we turn to the specific rule violations that the trial panel found.
A. Facts
Monroy was convicted of sexually abusing her 16-year-old foster child. The foster child brought a civil action against both Monroy and the agency that had placed him with her. In September 2011, while Monroy was appealing her criminal conviction and the civil matter was just beginning, Monroy hired respondent to investigate and file a post-conviction petition on her behalf once the direct appeal in the criminal case became final. At their first **624 meeting, respondent and Monroy discussed the possibility that respondent would handle the post-conviction matter for a flat fee of $5,000. However, when Monroy stated that she could pay only $2,000 upfront, they discussed other fee arrangements. Later, respondent sent Monroy a fee agreement that required Monroy to pay a $2,000 retainer, which would be earned upon receipt, and pay respondent $300 per hour for his services. Under that agreement, the first $2,000 that respondent earned under his hourly billing rate would be charged against the retainer.
When Monroy received the written fee agreement, she called respondent because she had expected that respondent would handle the post-conviction matter for a flat fee of $5,000. During the telephone call, Monroy and respondent discussed the hourly billing arrangement in the fee agreement, which Monroy ultimately signed. Monroy then paid the $2,000 retainer, and respondent deposited the retainer in his operating account.
Respondent started work on the post-conviction matter by obtaining and reviewing documents from the underlying criminal trial. He did not, however, begin drafting the post-conviction petition because Monroy's direct criminal appeal was still pending. Respondent did not send Monroy periodic billing statements for the work he did on the post-conviction matter and, as a result, did not notify her of the balance remaining on her $2,000 retainer.
*71 In October 2011, Monroy raised the possibility that respondent would also represent her in the civil matter. Respondent and Monroy agreed that she would pay a nonrefundable $1,000 retainer and that he would bill for his time on the civil matter at an hourly rate of $200. They agreed that the fees respondent earned at his hourly rate would be charged against the $1,000 retainer. Respondent prepared a written agreement to that effect and, in November 2011, Monroy signed it. She did not, however, pay him the $1,000 retainer.
For the next five months, most of the work that respondent performed for Monroy related to the civil matter. As to that matter, respondent attended hearings, navigated the discovery process, and attempted to negotiate a **625 dismissal of the plaintiff's civil claims against Monroy in return for her stipulating to facts that would help the plaintiff pursue his claims against the other defendant in the civil case. In performing those services, respondent generated around $4,000 in fees, which he billed to Monroy's sister on February 26, 2012. The sister paid $3,000 of that bill soon after receiving it.
In March 2012, respondent asked Monroy's sister to pay the $1,000 that remained from the February bill. On March 14, 2012, he told her, "I need the $1,000 balance due on [Monroy's] account paid today." At the same time, respondent told her that "[Monroy's direct] appeal [in the criminal matter] was affirmed without an opinion. I need to file the post conviction relief this week." That statement was not completely accurate. Although the Court of Appeals had affirmed Monroy's conviction, respondent could not file (and thus did not need to file) a petition for post-conviction relief until the appellate judgment issued, which occurred approximately two months later in May.
On March 20, 2012, respondent again asked Monroy's sister to pay the remaining $1,000 that Monroy owed on the civil matter. Something about respondent's request struck the sister as odd, and she searched the Internet for information on respondent. There, she discovered that respondent was going to be suspended from the practice of law. She told Monroy about the pending suspension, and Monroy asked respondent about it. When asked, respondent told Monroy that he was going to begin a 150-day suspension a few days later, on March 27, 2012. Respondent had known about the suspension since January 27, 2012, when he stipulated to a disciplinary order with the Bar resolving ethical violations that had occurred during 2006 and 2007.
Respondent told Monroy that he had arranged for another lawyer, Kliewer, to handle her civil and post-conviction cases during his suspension. He also told her that he would continue to be involved in those cases because he would work as Kliewer's paralegal or legal assistant during his suspension. Respondent led Monroy to believe that, although Kliewer would be representing her in court, respondent would continue to perform substantive legal **626 work on her civil and post-conviction matters. Given that understanding, Monroy agreed to have Kliewer take over her cases.
Respondent's representations to Monroy were, again, not completely accurate. Although Kliewer had agreed to handle some of respondent's cases during his suspension, Kliewer had not specifically discussed handling Monroy's matters, nor was Kliewer aware that she would be required to represent a client in a post-conviction and a civil matter, two areas of law that Kliewer did not ordinarily practice. Further, Kliewer had not agreed (and did not agree) to hire respondent to work as her legal assistant or paralegal during his suspension. When Kliewer took over Monroy's matters in March, Kliewer had a difficult time getting complete files from respondent and was not given access to any unearned advance fees that Monroy had paid respondent.
In May 2012, Kliewer found discovery requests in Monroy's civil matter that respondent had not addressed before his suspension and learned that a declaration, which was key to resolving the civil matter, required revision. At some point, Kliewer revised Monroy's declaration, which Monroy signed. After receiving the declaration, the plaintiff in the civil matter dismissed his claims against Monroy.
*72 Also in May 2012, Kliewer contacted the Bar about respondent's failure to properly notify his clients of his suspension and his failure to turn over documents and fees. Kliewer provided the Bar with a brief description of the matters she took over from respondent, which involved (in addition to Monroy) 10 other clients. As to Monroy, Kliewer told the Bar only that she had not received a complete file from respondent. The Bar began investigating the concerns that Kliewer had raised but did not immediately bring any charges.
In September 2012, after respondent was reinstated, Monroy terminated respondent's representation on the remaining post-conviction matter. She asked for a refund and for all of her files to be transferred to another lawyer, Roller. In October 2012, Roller asked respondent for Monroy's files and for any money that respondent owed Monroy. Respondent released Monroy's files on October 31, **627 2012, and told Roller that he had earned all the money that Monroy had paid him.
B. Claim Preclusion
With that background in mind, we turn to the facts related to respondent's claim preclusion defense. In June 2013, the Bar filed an amended formal complaint (the June 2013 complaint) against respondent alleging multiple rule violations. The June 2013 complaint grouped 18 claims for relief into seven "matters." One of those seven matters was denominated as the "Kliewer Matter."[8] The Kliewer Matter contained four claims for relief that arose out of respondent's representation of five clients (Chilcott, Swim, Oswenwengie, Lathan, and Clarke), whose cases respondent had transferred to Kliewer. Essentially, those four claims for relief alleged that: (1) respondent failed to tell Chilcott and Swim that their claims were being transferred to Kliewer; (2) respondent entered into flat-fee agreements with Oswenwengie, Lathan, and Clarke that did not contain the admonitions required for their advance payments to be treated as earned on receipt and, as a result, respondent had mishandled their funds; (3) respondent violated a different ethical rule by withdrawing from representing Oswenwengie, Lathan, and Clarke without refunding their unearned fees to them and promptly surrendering their files; and (4) after receiving a complaint from Kliewer, the Disciplinary Counsel's Office asked respondent for a response, but he knowingly failed to respond.
In September 2013, Monroy filed a bar complaint against respondent. In August 2014, while Monroy's complaint was being investigated and before the Bar filed any charges against respondent based on Monroy's complaint, the Bar and respondent discussed a possible settlement for the conduct charged in the June 2013 complaint. Those charges were set to be heard before a trial panel in August 2014, and the parties wanted to settle them before the hearing date.
Respondent raised the idea of wrapping the claims against him based on his representation of Monroy into the settlement of the charges alleged in the June 2013 complaint.
**628 The Bar's counsel responded that doing so was not practicable because the claims arising out of his representation of Monroy had not yet been presented to the State Professional Responsibility Board (SPRB), the entity within the Bar that determines which charges should be pursued. The Bar's counsel added that, in the absence of special circumstances, the SPRB could not review the charges involving Monroy before the August 2014 hearing on the June 2013 complaint. As a result, the Bar's counsel told respondent, "It looks like we will need to deal with the new matters separately from the formal proceedings. I mentioned to you earlier that we have no alternative but to do that."
Ultimately, the Bar and respondent settled the charges alleged in the June 2013 complaint, including those in the Kliewer Matter, by entering into a stipulated order of discipline. Regarding the allegations in the Kliewer Matter, respondent stipulated that "between December 6, 2010 and March 27, 2012, *73 he represented a number of clients ," whose fee agreements failed to comply with the rules of professional conduct. (Emphasis added.) Respondent also stipulated that he "failed to inform one or more clients that he would be suspended," that he "failed to notify one or more clients of his withdrawal" from representation and that Kliewer would be substituted as their counsel, and that he "failed to promptly surrender certain client files to Kliewer or otherwise act at the direction of the client." (Emphasis added.) Finally, respondent stipulated that his conduct violated various rules of professional conduct. On November 14, 2014, the Bar issued an order approving the stipulation and suspending respondent from the practice of law for six months.
In August 2015, the Bar filed this complaint, part of which arises out of respondent's representation of Monroy.[9] Regarding the charges involving Monroy, respondent argues **629 that those charges arose out of the same factual transaction or series of factual transactions as the charges in the Kliewer Matter, that the Bar reasonably could have included some or all the charges arising out of his representation of Monroy in its June 2013 complaint, and that claim preclusion prevents the Bar from pursuing those charges now.
Respondent's argument fails to distinguish two separate questions.[10] When an action has been reduced to a judgment, the question whether claim preclusion applies in a second action ordinarily will turn on whether the claims in the second action arose out of the same factual transaction as the claims in the first action. See Whitaker v. Bank of Newport , 313 Or. 450, 455, 836 P.2d 695 (1992) (stating that rule). However, when a stipulated judgment or consent decree is based on an underlying settlement, as it is in this case, the question whether claim preclusion applies turns on the intent of the parties in settling the first action. See Lancaster v. Carelli , 280 Or. 493, 498, 571 P.2d 899 (1977) (explaining that "[w]hether the second action is barred depends upon the intent of the parties in the execution of the stipulated interlocutory decree with particular emphasis upon the terms of the agreement"). See also Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Wright & Miller, 18A Federal Practice & Procedure § 4443, 254 - 55 (3d ed 2017) ("The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties.").[11] As the Eleventh Circuit has explained,
"In determining the res judicata effect of an order of dismissal based upon a settlement agreement, we should also attempt to effectuate the parties' intent. * * * Consequently, the scope of the preclusive effect of the 1977 Dismissal should not be determined by the claims specified in the original complaint, but instead by the terms of the Settlement **630 Agreement, as interpreted according to traditional principles of contract law."
Norfolk Southern Corp. v. Chevron, U.S.A. , 371 F.3d 1285, 1289 (11th Cir. 2004).
Because claim preclusion is an affirmative defense, respondent had the burden of proving by a preponderance of the evidence that the stipulated order of discipline was intended to resolve the Bar's claims arising out of *74 his representation of Monroy. See Troutman v. Erlandson , 287 Or. 187, 196, 598 P.2d 1211 (1979) (stating general principle). After reviewing the record, we conclude that respondent has not met his burden of persuasion. It is true that, in settling the Kliewer Matter, the stipulated order of discipline used general terms. For example, respondent stipulated that he undertook to represent "a number of" clients whose fee agreements were defective, that he failed to inform "one or more clients" that he would be suspended from the practice of law, that he failed to notify "one or more clients" of his withdrawal, and that he "failed to promptly surrender certain client files." The stipulation does not specify whether Monroy was among the unnamed clients to whom the stipulation applied.
However, if the stipulation is read in light of the allegations that gave rise to it, its intended scope becomes clearer. The allegations in the Kliewer Matter in the June 2013 complaint identified five clients whose claims gave rise to the charges included in the Kliewer matter. Monroy was not one of those clients. Moreover, when respondent's lawyer raised the prospect of wrapping any claims arising out of respondent's representation of Monroy into the stipulated order of discipline, the Bar told respondent that it could not do so because the SPRB first had to decide which, if any, charges should be brought against respondent based on his representation of Monroy. Given this record, we find that respondent failed to meet his burden of proving, by a preponderance of evidence, his affirmative defense of claim preclusion.[12] We accordingly turn to the rule violations that the trial panel found.
**631 C. Rule Violations
As noted above, the Bar alleged that respondent violated seven ethical rules. Those rule violations divide into four general categories. Three arise out of respondent's fee agreements and related actions. Two arise out of his failure to communicate with Monroy. One arises out of the fees respondent charged Monroy, and one violation arises out of the obligations that respondent owed Monroy when his representation of her ended.
1. Fee agreements
The trial panel found that the fee agreements in both the post-conviction matter and the civil matter violated RPC 1.5(c)(3) because those agreements denominated the fees as "earned on receipt" or "nonrefundable" without providing the required disclosures. The panel then found that respondent "did not put funds that he received on behalf of [Monroy] into a lawyer trust account in violation of RPC 1.15-1(a)." Finally, the trial panel found that respondent "placed funds in his own account before they were earned" in violation of RPC 1.15-1(c).
Respondent does not challenge the trial panel's findings that he violated those rules. Rather, he focuses his argument on the weight that should be given those violations in imposing a sanction. The Bar argues that the fee agreements in both matters violate RPC 1.5(c)(3) for the reasons that the trial panel identified. The Bar also argues that respondent violated RPC 1.15-1(a) and RPC 1.15-1(c) when he deposited the advance payment of $2,000 for the post-conviction matter in his operating account. However, the Bar does not argue that respondent placed any fees in the civil matter into his operating account before he earned them. We agree with the Bar in all respects.
2. Communication with Monroy
a. RPC 1.4(a)
The trial panel found that respondent violated RPC 1.4(a) because he failed to keep Monroy "reasonably informed about the status of her [post-conviction] matter." It **632 found, however, that the Bar had failed to prove that respondent did not keep Monroy reasonably informed about the status of her civil matter. The trial panel's opinion does not explain the factual basis for its first finding; that is, it does not specify what respondent should have told but did not tell Monroy regarding the post-conviction matter. *75 Respondent argues that, to the extent the trial panel based its finding on his failure to inform Monroy about the transfer of her cases to Kliewer, the panel was mistaken. As we read the trial panel's opinion, the trial panel did not base its finding that respondent violated RPC 1.4(a) on his failure to inform Monroy about the transfer of both her post-conviction and civil matters to Kliewer. If that had been the basis for the trial panel's RPC 1.4(a) finding, then the panel presumably would have found that respondent failed to keep Monroy informed about the status of both the civil matter and the post-conviction matter. However, the panel limited its finding to the post-conviction matter.
Not only does respondent's argument miss the mark, but the Bar's argument on review is equally unhelpful. In its brief on review, the Bar recites a series of events in both the post-conviction and the civil matters and then asserts, without further explanation, that respondent violated RPC 1.4(a) and RPC 1.4(b). The Bar's argument does not specify, much less explain, which omission or group of omissions it believes violated RPC 1.4(a), RPC 1.4(b), or perhaps both rules.
The Bar took a more helpful approach before the trial panel. There, the Bar argued that the salient failure on respondent's part was his failure to tell respondent when the criminal appeal was likely to end and when, as a result, respondent would file a post-conviction petition on her behalf. We agree with that argument. Monroy had told respondent that she wanted to file a post-conviction petition as soon as possible because of the effect of the criminal conviction on her family. Not only did respondent fail to inform Monroy when a post-conviction petition could legally be filed, but he gave her, through her sister, incorrect information on that issue. For that reason, respondent failed to keep Monroy **633 reasonably informed about the status of the post-conviction matter in violation of RPC 1.4(a).[13]
b. RPC 1.4(b)
RPC 1.4(b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The trial panel found that respondent violated that rule "particularly regarding his failure to explain his unilateral transfer of [Monroy's] case to another lawyer." On that point, respondent argues that he did not unilaterally transfer Monroy's case to Kliewer. Rather, he notes that he discussed the matter with Monroy before the transfer occurred and that she agreed to it. He accordingly disagrees that his explanation was insufficient to permit her to make an informed decision about the transfer.
The difficulty with respondent's argument is that the information that he told Monroy was either inaccurate or incomplete. For example, he told her that he would work with Kliewer during the period of his suspension as a law clerk or a paralegal and that, as a result, he would work on her post-conviction and civil matters even while suspended. Kliewer, however, had not and did not agree to that arrangement. Beyond that, respondent did not explain to Monroy whether the fees that she had paid him for those matters would be available to Kliewer or whether Monroy would owe Kliewer additional funds for the work that Kliewer did on Monroy's behalf. Put differently, Monroy agreed to the transfer without a reasonable understanding of how the work on her cases would be handled and what her financial obligations to Kliewer would be. The trial panel correctly found that respondent violated RPC 1.4(b).
3. Excessive fee
The trial panel found that respondent violated RPC 1.5(a) because he "charged an excessive fee for the work **634 undertaken and performed." The trial panel did not explain the factual basis for that finding, and we are hard pressed to supply one. We start with what is clear from the record. Monroy and her sister paid respondent a total of approximately *76 $6,000 for his work on both the post-conviction and the civil matter. Of that amount, Monroy paid respondent $2,000 in advance for his work on the post-conviction matter, and Monroy or her sister paid him $4,000 for his work on the civil matter based on his billings.
The Bar argues that the $4,000 that Monroy paid in the civil matter was excessive because respondent's efforts did not result in the dismissal of the civil matter. The Bar notes that the civil matter was not dismissed until Kliewer took over Monroy's civil case while respondent was suspended. While true, the Bar's argument fails to account for the work that respondent did, which is discussed above, before he transferred the civil matter to Kliewer. Moreover, although Kliewer revised a declaration that respondent had drafted, which resulted in the dismissal of the civil claims against Monroy, respondent performed the lion's share of the work on the civil matter that led to the dismissal. The Bar has not persuaded us by clear and convincing evidence that respondent charged an excessive fee for the civil matter.
The Bar also argues that respondent charged an excessive fee for the post-conviction matter. As we understand the Bar's argument, it rests on the proposition that Monroy paid respondent an advance fee of $2,000 but got nothing in return.[14] Although respondent did not submit periodic billings for his work on the post-conviction matter, the record contains timesheets showing the hours he devoted to reviewing the criminal file, researching legal theories, meeting with Monroy, checking on the status of the criminal appeal, and taking or initiating telephone calls from Monroy. It is true, as the Bar notes, that respondent never filed a post-conviction petition on Monroy's behalf. However, **635 he was suspended before he could do so, and Monroy discharged him when his suspension ended. The Bar does not question the hourly rate to which Monroy and respondent agreed, nor does it provide a basis for questioning the hours that respondent reported spending on the post-conviction matter. On this record, we cannot say that the Bar proved by clear and convincing evidence that respondent charged Monroy an excessive fee for the work he did in preparation for filing a post-conviction petition.
4. Termination of representation
RPC 1.16(d) provides:
"Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers, personal property and money of the client to the extent permitted by other law."
The trial panel found that, when respondent's representation of Monroy ended, respondent "did not take steps reasonably practicable to protect [Monroy's] interests." The trial panel did not state what steps respondent should have taken. Respondent, for his part, asserts that the trial panel erred in finding that he violated this rule but does not explain why the panel erred.
The Bar notes that, when respondent was suspended and later when Monroy retained another lawyer, Roller, respondent unreasonably delayed transferring his files both to the substitute counsel (Kliewer) and to Monroy's new counsel (Roller). We agree that respondent violated the rule in failing to turn over his files in a timely manner. Additionally, the Bar argues that respondent failed to return the unearned fees that Monroy had paid him. As explained above, the Bar failed to prove by clear and convincing evidence that respondent retained any unearned fees. Accordingly, we disagree with that part of the Bar's argument.
**636 III. LYONS
In March 2013, Lyons retained respondent to represent him in two criminal matters, one *77 in Multnomah County and the other in Columbia County. Their written agreement required Lyons to pay respondent a flat fee of $7,500 to negotiate either a dismissal before trial or a plea agreement in both cases. That agreement denominated the $7,500 flat fee as "earned on receipt" and contained the disclosures that RPC 1.5(c)(3) requires. It advised Lyons that the money would not be held in respondent's trust account and that, if Lyons discharged respondent, he would be entitled to a refund of "all or part of the fee if the services for which the fee was paid are not completed." The agreement also provided that, "if this matter should go to trial and sentencing, then there will be an additional, non-refundable, earned-upon-receipt fee, which will be negotiated separately." A footnote in the agreement stated that "[t]he typical flat fee for trial is calculated at $2,500.00 for each day of trial, court or jury trial, and $2,500.00 for a sentencing hearing if client found guilty of any charge at trial."
Lyons' grandmother paid respondent $7,500. Because the written agreement contained the disclosures required by RPC 1.5(c)(3), respondent properly deposited those funds into his operating account.
By mid-May 2013, it appeared that the Multnomah County case might go to trial. Respondent told Lyons that he would represent him at trial for a $3,000 flat fee. Respondent also told Lyons that, although he was collecting the trial fee before it was certain that there would be a trial, the money would go into respondent's trust account and respondent would return the $3,000 fee if the case did not "go to trial." Lyons' grandmother was reluctant to pay the fee in advance of the trial but ultimately provided respondent with the $3,000 payment after discussing it with him. Respondent deposited the $3,000 into his operating account.
The criminal trial in Multnomah County was scheduled to begin on Monday. On the Friday before trial began, respondent and the state appeared at call and told the trial court that they were ready to proceed to trial, and the case **637 was assigned to a judge. However, later that day, the parties reached a tentative agreement, which they planned to present to the court on Monday instead of proceeding to trial. Initially, Lyons was equivocal about accepting the agreement, but he accepted the state's offer on Monday morning and entered his guilty plea that morning.
Later, the Columbia County case also settled. Lyons's grandmother attended the sentencing hearing in Columbia County. After the hearing, respondent came out and spoke to her. He told her that "he was going to go back to the office and get a check cut to refund [her] the money because all it was just that sentencing hearing and there was no trial because they went ahead with the plea bargain stuff." When no check arrived, Lyons's grandmother called respondent's office repeatedly to ask about the refund. She talked to his assistant, called his cell phone, and left messages for him. She never heard back from respondent.
Lyons filed an ethics complaint with the Bar. At the hearing on that complaint, respondent acknowledged that his written agreement did not explain when a case would "go to trial." He testified, however, that it was his practice to go over the terms of the contract, explain what a flat fee is, what the trial fee would be for each day, and when "that trial fee kicks in." However, he could not recall specifically having that discussion with Lyons, and Lyons did not remember respondent telling him that the trial fee would "kick in" when the case was called for trial.
Given those facts, the trial panel found that respondent had violated three rules. Specifically, it found that respondent had: (1) collected an earned-upon-receipt fee without entering a written fee agreement containing appropriate disclosures under RPC 1.5(c)(3) ; (2) deposited advance-paid fees into his operating account without an appropriate "earned upon receipt" agreement, RPC 1.15-1(c) ; and (3) failed to protect Lyons' interests upon termination of representation by returning the unearned trial fee, RPC 1.16(d). Respondent challenges each of those findings.[15]
*78 **638 A. RPC 1.5(c)(3)
Respondent entered into two fee agreements with Lyons. One was written; the other, oral. In answering the Bar's charges, respondent admitted that his written fee agreement violated RPC 1.5(c)(3), and the trial panel found that he violated that rule based on his admission. On review, respondent argues that he should not be held to the admission in his answer because the written fee agreement clearly complied with RPC 1.5(c)(3). Respondent accordingly focuses his argument on review on whether the oral agreement to pay the $3,000 trial fee was an extension of the written agreement that incorporated its terms and thus complied with RPC 1.5(c)(3).
On review, the Bar does not dispute that the written fee agreement for pretrial work complied with RPC 1.5(c)(3). The Bar, however, focuses on the oral agreement for the trial fee. It takes the position that, because respondent "deemed [the $3,000 trial fee] nonrefundable and earned on receipt," respondent's collection of that fee violated RPC 1.5(c)(3). The Bar notes that there was no written agreement concerning the $3,000 trial fee, much less a written agreement that contained the disclosures required by RPC 1.5(c)(3).[16]
In resolving the parties' arguments, we note as an initial matter that respondent does not dispute that RPC 1.5(c)(3) applies to his oral agreement to receive the $3,000 flat fee if one or more of the criminal cases went to trial. His argument turns instead on whether the oral agreement complied with RPC 1.5(c)(3). On that issue, RPC 1.5(c)(3) requires that the fee agreement be written, not oral. Here, the agreement for the $3,000 trial fee was oral and separate from the written agreement for respondent's work in negotiating a pretrial settlement or dismissal. It necessarily follows that respondent's oral agreement did not comply with the rule.
**639 Moreover, even if the form of the agreement were immaterial, the burden was on respondent to prove that the separate oral agreement complied with RPC 1.5(c)(3) by incorporating by reference the disclosures in the written fee agreement. See Balocca , 342 Or at 289, 151 P.3d 154 (placing the burden of proof on the lawyer to prove that his or her written agreement contains the necessary disclosures to come within an exception to the ordinary rule that unearned fees must be deposited in a lawyer's trust account). Respondent has not met that burden. The record does not disclose (much less establish) that, in negotiating the $3,000 trial fee with Lyons, respondent cross-referenced the written fee agreement, or entered into an oral agreement that incorporated by reference the terms of the prior written agreement. The oral agreement violated RPC 1.5(c)(3).
B. RPC 1.15-1(c)
The trial panel also found that respondent violated RPC 1.15-1(c), which requires that fees paid in advance be deposited in a lawyer's trust account unless the fee is denominated as earned on receipt and the parties' fee agreement complies with RPC 1.5(c)(3). Given our conclusion that the respondent's oral fee agreement did not comply with RPC 1.5(c)(3), it necessarily follows that respondent violated RPC 1.15-1(c) when he deposited the $3,000 trial fee in his operating account.
C. RPC 1.16(d)
The remaining question is whether respondent violated RPC 1.16(d) when he refused to return the $3,000 trial fee after both criminal cases settled. Respondent argued before the trial panel that, under the terms of his written agreement with Lyons, he was entitled to retain the trial fee if the Multnomah County case "went to trial" and that the case had gone to trial when he *79 reported at call on Friday that he was ready for trial the following Monday. The trial panel found that, even if respondent's interpretation of the phrase "went to trial" were permissible, respondent did not communicate that understanding to Lyons. As a result, the phrase "went to trial" should be given its ordinary meaning-namely, respondent would not earn the trial fee **640 until either the Multnomah County or the Columbia County criminal trial actually began.
We agree with that conclusion. We find that respondent did not tell Lyons that the $3,000 trial fee would be triggered when either criminal case was called for trial. Objectively, it seems unlikely that respondent would have addressed that issue with Lyons when they discussed the written fee agreement. That agreement covered pretrial negotiation, and there was no apparent reason for respondent to explain when he would earn a trial fee in discussing an agreement that, by its terms, did not apply to trial work. Moreover, respondent did not testify that he ordinarily would have discussed the triggering point for the trial fee when he entered into the oral agreement with Lyons. Rather, his testimony regarding his usual practices with clients focused on the written agreement, which did not implicate the starting date for a trial fee.
More importantly, Lyons's grandmother, whom the trial panel found to be "highly credible, based on demeanor," testified that respondent told her after the sentencing hearing in Columbia County that he was going to go back and cut a check to refund the trial fee because "there was no trial." When respondent never sent a check, Lyons's grandmother called him repeatedly, but he never responded to her calls asking about the refund. Not only did respondent admit that no trial had occurred and that Lyons was due a refund, but his failure to respond to the grandmother's repeated inquiries about the promised refund undercuts the position he later took that no refund was due under the terms of one or the other of his agreements with Lyons.
One other point requires discussion. As the trial panel noted, respondent's interpretation of the phrase "go to trial" was a permissible one. However, it was not the ordinary meaning of that phrase. If, as we conclude, respondent did not share that understanding with Lyons, then the phrase "go to trial" in the written agreement and its apparent counterpart in the oral agreement should be given their usual meaning. Respondent would earn the trial fee when the trial actually began, as opposed to when the case was called for trial on Friday to begin on the following Monday.
**641 We accordingly find that respondent agreed to refund the trial fee if the case settled before the trial actually began. It follows that all respondent's work representing Lyons fell within the $7,500 fee that respondent collected to negotiate a settlement. None of it fell within $3,000 fee that respondent collected to represent Lyons at trial. Respondent violated RCP 1.16(d) when he did not refund the $3,000 trial fee.
IV. SANCTION
The trial panel suspended respondent from the practice of law for one year. Respondent argues that, to the extent that he violated the rules of professional conduct, his violations were the result of negligence and mostly matters of form, not substance. In his view, a reprimand or a minor suspension should suffice to protect the public. The Bar views respondent's violations differently. In the Bar's view, respondent's repeated failure to conform his conduct to the ethical rules evinces a disregard for his clients' interests that warrants a substantial sanction. It reasons that the trial panel should have suspended him from the practice of law for two years, not one.
In determining the appropriate sanction for violating the rules of professional conduct, we look initially to the American Bar Association's Standards for Imposing Lawyer Sanctions (ABA Standards). See In re Gatti , 356 Or. 32, 55, 333 P.3d 994 (2014). Those standards identify a presumptive sanction-disbarment, suspension, reprimand, or admonition-for each rule violation based on the duty violated, the lawyer's mental state, and the actual or potential harm to the client. We also consider aggravating and mitigating factors to determine whether a greater or lesser sanction should apply. Finally, we consider *80 this court's cases to ensure that, to the extent possible in what is necessarily a case-specific inquiry, we are treating similarly situated cases the same. See In re Ramirez , 362 Or. 370, 380, 408 P.3d 1065 (2018).
In this case, respondent violated duties that he owed his clients. He violated the duty to preserve and properly handle client property when he deposited Prado-Hernandez's, Monroy's, and Lyons's funds in his operating **642 account without proper written agreements, when he failed to turn over Monroy's files when his representation of her ended, and when he retained the unearned fees that Lyons had paid him in advance. ABA Standards at 5. He violated the duty of diligence that he owed to his clients when he failed to respond promptly to Prado-Hernandez's and Monroy's reasonable requests for information and when he failed to explain the transfer of Monroy's files to Kliewer to the extent reasonably necessary to permit her to make an informed decision. Id.
Respondent acted knowingly in depositing the advance fees that Prado-Hernandez's wife paid him into his operating account. Although respondent argues that his action was merely negligent because he meant to have Prado-Hernandez sign a written fee agreement, the fact remains that respondent deposited the money in his operating account before he ever met with Prado-Hernandez. He knew at that point that Prado-Hernandez had not signed a written agreement that would permit him to take that action. However, Prado-Hernandez suffered only a potential injury from that violation. Respondent knowingly failed to respond promptly to Prado-Hernandez's reasonable requests for information, and Prado-Hernandez suffered actual injury in the form of the unnecessary anxiety and frustration. See In re Cohen , 330 Or. 489, 496, 8 P.3d 953 (2000) (noting that client's anxiety and frustration constitute injuries).
Respondent knowingly violated his duty of diligence to Monroy when he failed to respond promptly to her requests for information about the status of her post-conviction case and when he failed to provide her with information reasonably necessary to make an informed decision regarding the transfer of her cases to Kliewer. He knowingly violated his duty of loyalty to Monroy when he unreasonably delayed transferring her files to her new counsel when his representation of her ended. Monroy experienced actual injury in the form of unnecessary anxiety and frustration as a result of those violations.
Respondent negligently violated his duty of loyalty to Lyons when he deposited the $3,000 advance fee in his operating account. He should have known that the **643 separate oral agreement did not comply with RPC 1.5(c)(3). Finally, respondent knowingly violated his duty of loyalty to Lyons when he retained the advance fee. If, as we find, he told Lyons's grandmother after the sentencing hearing in Columbia County that he would refund the $3,000 trial fee because "there was no trial," his failure to refund the fee was, at a minimum, knowing. Respondent's failure to return those funds caused Lyons and his grandmother actual injury.
Considering the duty violated, respondent's mental state, and the injuries and potential injuries that resulted, we find that suspension is the presumptive sanction solely for respondent's failure to refund the $3,000 trial fee to Lyons. ABA Standard 4.12 ("Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."). Moreover, even if all of respondent's breaches of the duty of diligence that he owed to Prado-Hernandez and Monroy were negligent, suspension would be the appropriate sanction for that pattern of neglect. ABA Standard 4.42(b) ("Suspension is generally appropriate when * * * a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.").
We also consider aggravating and mitigating circumstances. Regarding aggravating factors, respondent has substantial experience in the practice of law, ABA Standards 9.22(i); he committed numerous violations, ABA Standards 9.22(d); and his clients were vulnerable victims, which makes his failure to keep them reasonably informed all the more egregious, ABA Standards 9.22(h).
The more significant aggravating factors are respondent's pattern of misconduct, ABA Standards 9.22(c), and his prior *81 disciplinary offenses, ABA Standards 9.22(a). Sometimes, we have conflated those two aggravating factors. See In re Bourcier , 325 Or. 429, 435-36, 939 P.2d 604 (1997) ; In re Schaffner , 325 Or. 421, 427, 939 P.2d 39 (1997). As those cases demonstrate, when a lawyer violates a rule for which he or she previously has been disciplined, the prior violation can establish both a record of prior discipline and a pattern of misconduct. See id. (finding both aggravating **644 factors in that circumstance). However, the two aggravating factors are not always coextensive. To qualify as a prior disciplinary offense, the prior offense must have been adjudicated before the imposition of the current sanction and the similarity and temporal relationship between the prior offense and the current offense are also relevant. See In re Jones , 326 Or. 195, 200, 951 P.2d 149 (1997) (listing those and other considerations). By contrast, a pattern of misconduct does not necessarily require proof of a prior sanction. Rather, that aggravating factor bears on whether the violation is a one-time mistake, which may call for a lesser sanction, or part of a larger pattern, which may reflect a more serious ethical problem.
In his case, respondent has been admonished or sanctioned in three prior lawyer disciplinary proceedings.[17] However, only one of those proceedings constitutes a "prior disciplinary offense" under our cases; that is, only one sanction preceded respondent's acts that led to this proceeding and involved similar violations. See id. (listing those considerations). Specifically, in 2002, the Bar admonished respondent for depositing flat-fee retainers into his operating account without first entering into a written fee agreement and for failing to timely refund fees to clients. Cf. Cohen , 330 Or. at 498-99, 8 P.3d 953 (holding that a letter of admonition counts as a prior disciplinary offense for the purposes of ABA Standards 9.22(a)). That prior disciplinary offense for a similar violation "carr[ies] significant weight in aggravation, because [its] presence demonstrates that the accused is careless with respect to his ethical obligations."
**645 In re Knappenberger , 340 Or. 573, 586, 135 P.3d 297 (2006) (internal citation and quotation marks omitted).
We do not consider the rule violations for which the 2014 sanction was imposed (including the Kliewer Matter) as "prior disciplinary offenses" because the acts that gave rise to this disciplinary proceeding occurred before the imposition of the 2014 sanction. See Jones , 326 Or. at 200, 951 P.2d 149 (identifying that limitation). Nonetheless, the rule violations underlying the 2014 sanction are sufficiently similar to many of the rule violations in this disciplinary proceeding that they establish a "pattern of misconduct" that warrants an enhanced sanction. Put differently, the rule violations at issue in this disciplinary proceeding are not an isolated occurrence on respondent's part. Rather, they are part of a larger pattern of disregard for the interests of his clients that warrants an enhanced sanction. We also disagree with respondent that, because he has already been sanctioned for violating other clients' interests, no additional sanction or only a minor additional sanction is warranted for violating these clients' interests. In our view, the sheer scope of the pattern of misconduct, which this case confirms, demonstrates that an enhanced sanction is appropriate.
Against those substantial aggravating circumstances, we find only one mitigating circumstance. During the relevant time period for the Prado-Hernandez and Monroy matters, respondent was experiencing personal or emotional problems-namely, serious financial and tax problems and the stress resulting from those problems. ABA Standards *82 9.32(c). Based on that record, we find that the aggravating circumstances substantially outweigh the mitigating circumstances.
Finally, we consider our cases. No previous case presents the same constellation of violations and aggravating and mitigating circumstances. Respondent's proposed suspension of not more than 30 days is inadequate under the case law in light of the breadth and scope of his violations. Several of his violations, standing alone, could justify a suspension exceeding that amount. For example, in Inre Peterson , 348 Or. 325, 232 P.3d 940 (2010), we imposed a 60-day suspension on a lawyer for violations of RPC 1.15-1(a)
**646 and RPC 1.15-1(c) in a single matter. Id. at 345, 232 P.3d 940 ("The failure of a lawyer with substantial experience to carry out fully the responsibilities imposed by RPC 1.15-1(a) and RPC 1.15-1(c) for the protection of client funds in a lawyer trust account is a serious deviation from the legal profession's ethics."). And we have also explained that, in some cases, "a finding that a lawyer has failed to adequately explain a legal matter to a client under RPC 1.4(b), without more, also justifies a 30-day suspension." Gatti , 356 Or. at 57, 333 P.3d 994. Respondent's conduct in this case implicates multiple clients over a period of many years and involves aggravating circumstances that substantially outweigh the mitigating circumstances. As a result, respondent's suspension must exceed the 30 days that respondent proposes.
Nevertheless, the two-year suspension proposed by the Bar also lacks support in our case law. In previous cases involving neglect by lawyers with disciplinary histories and substantial experience in the law, we have imposed one-year suspensions. See Knappenberger , 340 Or. at 588, 135 P.3d 297 (one-year suspension); In re Meyer , 328 Or. 220, 229, 970 P.2d 647 (1999) (one-year suspension). In this case, some of respondent's violations were negligent; however, many were knowing. While we are not persuaded that the mix of negligent and knowing violations in this case warrants a two-year suspension, we cannot overlook respondent's knowing refusal to refund Lyons the $3,000 trial fee, his knowing failure to respond to Prado-Hernandez's reasonable requests regarding the status of his case, or respondent's knowing failure to provide Monroy with information necessary for her to make an informed decision about the transfer of her cases to another lawyer. We accordingly conclude that respondent should be suspended from the practice of law for a period of 18 months rather than a year as the trial panel found.
Respondent is suspended from the practice of law for a period of 18 months, commencing 60 days from the date of this decision.

We find the facts set out in this opinion by clear and convincing evidence.

RPC 1.15-1(a) required respondent to hold Prado-Hernandez's property in a lawyer trust account separate from respondent's property and RPC 1.15-1(c) required respondent to put unearned fees in a lawyer trust account. Because respondent had not yet earned the funds that Prado-Hernandez's wife paid him and because he had not entered into a written agreement that would have justified treating those fees as earned on receipt, he violated both rules when he put the funds that Prado-Hernandez's wife paid him into his operating account. See In re Fadeley , 342 Or. 403, 409-10, 153 P.3d 682 (2007) (requiring such an agreement as a precondition to depositing funds in a lawyer's operating account).

Although the Bar challenges that ruling on review, it does not challenge the trial panel's other adverse rulings regarding Prado-Hernandez.

Of course, if there were a legitimate basis for seeking post-conviction relief, then respondent would have been obligated under his view of the agreement to file and litigate the post-conviction action for the $5,000 flat fee.

The question whether the parties entered into a flat-fee agreement and what a lawyer must do to earn the flat fee is separate from the question whether fees are denominated as "earned on receipt" and, if they are, whether the agreement contains sufficient disclosures to permit the lawyer to deposit them into his or her operating account. The latter question essentially is an affirmative defense, and the lawyer bears the burden of production and persuasion to show that the defense applies. Balocca , 342 Or. at 288-89, 151 P.3d 154. The former question, which is at issue here, involves proving a rule violation, and the Bar bears the burden of production and persuasion on that issue. See id. at 292-93, 151 P.3d 154 (effectively placing the risk of nonpersuasion on that issue on the Bar).

Respondent does not argue that the Bar should have charged him with violating RPC 1.16(d) rather than RPC 1.15-1(d) for failing to return unearned funds on the termination of his representation, and we express no opinion on that issue.

We note that the terms of RPC 1.15-1(d), read as a whole, appear to apply most naturally to a lawyer's obligation to notify a client or third party when a settlement or other funds have been received, to promptly deliver the funds that the client or third party is entitled to receive, and to provide the client an accounting when requested. See In re Webb , 363 Or. 42, 48-49, 418 P.3d 2 (2018) (applying that rule in those circumstances); In re Lopez , 350 Or. 192, 196, 252 P.3d 312 (2011). However, this court has also applied the rule to unearned funds that the client had paid to the lawyer. See In re Obert , 352 Or. 231, 237, 282 P.3d 825 (2012). Respondent does not specifically argue that RPC 1.15-1(d) should be limited to the former situation.

The other six matters arose out of alleged violations that were unconnected to the files that respondent transferred to Kliewer.

Specifically, the Bar charged respondent with failing to keep Monroy reasonably informed about the status of a matter and failing to promptly comply with reasonable requests for information, RPC 1.4(a) ; failing to explain a matter to the extent reasonably necessary to permit Monroy to make informed decisions regarding the representation, RPC 1.4(b) ; collecting a clearly excessive fee, RPC 1.5(a) ; collecting an earned-upon-receipt fee without entering a written fee agreement containing appropriate disclosures, RPC 1.5(c)(3) ; failing to keep Monroy's property separate from the lawyer's own property, RPC 1.15-1(a) ; depositing advance-paid fees into the lawyer's operating account without first entering an appropriate "earned-upon-receipt" agreement, RPC 1.15-1(c) ; and failing to protect Monroy's interests upon termination of representation, RPC 1.16(d).

Respondent assumes that claim preclusion applies to lawyer disciplinary proceedings, as does the Bar. Given that shared assumption, we also assume without deciding that claim preclusion applies in this context.

Claim preclusion applies only if the settlement has been reduced to a final order, decree, or judgment. See 18A Federal Practice & Procedure at § 4443. In this case, respondent's stipulation was embodied in a final order.

Given our resolution of respondent's claim preclusion defense, we neither decide nor express any opinion on the question whether the Bar's claims against respondent arose out of the same factual transaction.

The Bar does not expressly challenge the trial panel's finding that the Bar did not prove that respondent failed to keep Monroy reasonably informed about the status of the civil matter, although it intimates that there might be a problem. Without a coherent, cognizable argument from the Bar on that issue, we decline to overturn the trial panel's finding.

At some points, the Bar refers to Monroy's understanding that she paid respondent $5,000 on the post-conviction matter. That understanding, however, is inconsistent with the written fee agreement, and the fact that Monroy paid respondent a total of approximately $6,000 total for both matters, $4,000 of which was for the civil matter.

The Bar also charged respondent with engaging in professional misconduct, RPC 8.4(a)(3). The trial panel found that respondent had not violated that rule, and the Bar does not challenge that finding on review.

RPC 1.5(c)(3) provides that a "lawyer shall not enter into an arrangement for, charge, or collect * * * a fee denominated as 'earned on receipt,' 'nonrefundable' or in similar terms unless it is pursuant to a written agreement" that is signed by the client and that explains that the fee will not be deposited in the lawyer's trust account and is, in fact, refundable in whole or in part if the lawyer is discharged without having provided all or some of the services he or she agreed to provide.

In 2002, the Bar admonished respondent for depositing flat-fee retainers into his operating account without first entering into a written fee agreement and failing to timely refund fees to a client. In 2012, respondent received a 150-day suspension for making improper deposits into and improper withdrawals from his trust account, leading to numerous overdrafts. And in 2014, respondent received a six-month suspension for misrepresenting to his employees that he was withholding and paying their income and payroll taxes, using improper fee agreements, failing to respond to clients, failing to keep clients informed, failing to refund fees, and failing to provide an accounting. The 2014 sanction included conduct charged in the Kliewer matter. Although the 2014 sanction preceded the imposition of the sanction in this case, respondent had not been "sanctioned for [those offenses] before engaging in the offense in the case at bar." Jones , 326 Or. at 200, 951 P.2d 149 (listing that limitation). Accordingly, the 2014 sanction does not constitute a prior disciplinary offense.